Frank Composto, J.
This proceeding was brought pursuant to CPLR article 78 to restrain the respondent, New York City Transit Authority, from freezing the salaries of those employees represented by the petitioner union. An examination of the moving papers reveals that what is actually sought is a declaratory judgment invalidating certain portions of the New York State Financial Emergency Act for the City of New York (L 1975, chs 868-870) as being unconstitutional.
Petitioner, Subway-Surface Supervisors Association (SSSA) is a labor union which is the certified collective bargaining agent for various supervisory employees of the respondent Transit Authority. As such, SSSA has entered into a contract with respondent on behalf of its members, the terms of which provide for a general wage increase as well as certain increases in differential payments as of October 1, 1975.
The New York State Legislature, in the 1975 Extraordinary Session, held in early September, enacted the New York State Financial Emergency Act for the City of New York (ch 868). Included therein as section 10 is a wage freeze which provides (as amd L 1975, ch 870) as follows:
"1. Increases in salary or wages of employees of the city and employees of covered organizations which have taken effect since June thirtieth, nineteen hundred seventy-five or which will take effect after that date pursuant to collective bargaining agreements or other analogous contracts, now in existence or hereafter entered into, requiring such salary increases as of July first, nineteen hundred seventy-five or as of any date thereafter are hereby suspended. All increased payments for holiday and vacation differentials, shift differentials, salary adjustments according to plan and step-ups or'increments for employees of the city and employees of covered organizations which have taken effect since June thirtieth, nineteen hundred seventy-five or which will take effect after that date *697 pursuant to collective bargaining agreements or other analogous contracts requiring such increased payments as of July first, nineteen hundred seventy-five as of any date thereafter are hereby, in the same manner, suspended. For the purposes of computing the pension base of retirement allowances, the suspended salary or wage increases and the suspended other payments shall not be considered as part of compensation or final compensation or of annual salary earned or earnable. The suspensions provided herein shall be effective for the first pay period ending on or subsequent to September first, nineteen hundred seventy-five and shall continue until one year thereafter and, to the extent of any determination of the board that a continuation of such suspensions, to a date specified by the board, is necessary in order to achieve the objectives of the financial plan, such suspensions shall be continued to the date specified by such board, which date shall in no event be later than the end of the emergency period.”
That section further provides that the foregoing wage freeze shall not be applicable to those employees who have individually or through their union agreed to a deferment of salary in such form as is acceptable by the Mayor (prior to September 1, 1975) or the Emergency Financial Control Board (subsequent to September 1, 1975).
Subdivision 5 of section 2 of the Financial Emergency Act defines covered organizations referred to in the wage freeze to specifically include the respondent, New York City Transit Authority, as well as several other authorities, agencies and commissions.
In furtherance of the clear mandate of the wage freeze provisions of the foregoing legislation, respondent Transit Authority, through its Director of Labor Relations, notified petitioner that the previously contracted increases in wages and differentials for its members scheduled to take effect October 1, 1975 would not be paid.
Petitioner has made several claims with respect to the legality of the actions on the part of the Transit Authority, and indeed on the part of the Legislature in enacting the Financial Emergency Act. These claims can best be summarized as:
1. Violation of section 10 of article I of the United States Constitution, which prohibits a State from enacting any law impairing contract obligations.
2. Violation of section 7 of article V of the New York *698 Constitution, which prohibits impairment of pension benefits for public employees.
3. A claim that the Financial Emergency Act was not intended to apply to the Transit Authority or its employees.
4. Violation of the 14th Amendment of the United States Constitution and section 11 of article I of the New York Constitution (equal protection of'the law).
The clause in the United States Constitution which prohibits the impairment of contract obligations by State governments (art. I, § 10) has been interpreted by the Supreme Court of the United States as well as the courts of this State to be something less than a rigid prohibition. It has been regarded as a proscription qualified by the power of the States to maintain order and to safeguard the public welfare (Home Building & Loan Assn. v Blaisdell, 290 US 398; East New York Bank v Hahn, 326 US 230, affg 293 NY 622; Patrolmen’s Benevolent Assn. v City of New York, 59 Misc 2d 556).
In enacting the Financial Emergency Act, the Legislature made specific findings (L 1975, ch 868, § 1) including:
"It is hereby found and declared that a financial emergency and an emergency period exists in the city of New York. The city is unable to obtain the funds needed by the city to continue to provide essential services to its inhabitants or to meet its obligations to the holders of outstanding securities. Unless such funds are obtained the city will soon (i) fail to pay salaries and wages to employees and amounts owed vendors and suppliers to the city, (ii) fail to pay amounts due to persons receiving assistance from the city and (iii) default on the interest and principal payments due the holders of outstanding obligations of the city.
"If such failures and defaults were to occur, the effect on the city and its inhabitants would be devastating: (1) unpaid employees might refuse to work; (2) unpaid vendors and suppliers might refuse to sell their goods and render services to the city; (3) unpaid recipients of public assistance would be unable to provide themselves with the basic necessities of life; and (4) unpaid holders of city obligations would seek judicial enforcement of their legal rights as to city revenues. These events would effectively force the city to stop operating as a viable governmental entity and create a clear and present danger to the health, safety and welfare of its inhabitants.”
*699 "This situation is a disaster and creates a state of emergency. To end this disaster, to bring the emergency under control and to respond to the overriding state concern described above, the state must undertake an extraordinary exercise of its police and emergency powers under the state constitution, and exercise controls and supervision over the financial affairs of the city of New York, but in a manner intended to preserve the ability of city officials to determine programs and expenditure priorities within available financial resources.”
In fact, section 2-a of the act contains the following:
"The legislature hereby finds and declares that a state of financial emergency exists within the city.”
The current fiscal crisis facing this city is common knowledge to all parties concerned even without the foregoing official recognition of same. Indeed, petitioner herein does not dispute the legislative findings contained in the Financial Emergency Act.
The crisis itself has been recently recognized by at least two courts in this city. In Flushing Nat. Bank v Municipal Assistance Corp. (84 Misc 2d 976) Justice Baer of Supreme Court, New York County ruled that the Moratorium Act (L 1975, ch 874), enacted as a further measure to combat the present financial emergency, was not in violation of section 10 of article I of the United States Constitution since priority must be given "to the public interest over strict compliance with the contract clause.”
In Patrolmen’s Benevolent Assn. v City of New York (NYLJ, Dec. 31, 1975, p 8 col 2), Justice Starke of New York County took judicial notice of the same fiscal emergency facing the city in staying the enforcement of a judgment against the city won in a labor dispute by a group of public employees. The stay is to continue during the fiscal emergency as set forth in the Financial Emergency Act.
It having been determined that there is an emergency situation present which would serve as a basis for an exception to the proscription against interference with contract rights, the court must now look to whether the particular legislation here involved "is addressed to a legitimate end and the measures taken are reasonable and6 appropriate to that end” (Home Bldg. & Loan Assn. v Blaisdell, supra p 438; see, also, Treigle v Acme Homestead Assn., 297 US 189).
*700 In determining this question, the petitioner has asked the court to conclude that the New York City Transit Authority, in providing transportation services to the people of the city, is not performing a governmental function and is not in any way connected to the city’s fiscal plight.
The court finds that this argument is completely without merit. The Transit Authority is a public benefit corporation formed by the State Legislature to operate the transit facilities owned by the City of New York for the benefit of its citizens (Public Authorities Law, § 1200, et seq.). The operation of the transit facilities and their maintenance and improvement are financed both by revenues generated by operations and public funds from the city, State and Federal governments (see, e.g., L 1972, ch 7; L 1975, ch 56).
The authority’s employees are regarded as public employees with civil service status and benefits. Indeed, petitioner in this proceeding claims protection of public employee pension provisions of the New York Constitution.
It is the opinion of the court that the respective financial conditions of the City of New York and the New York City Transit Authority are dependent upon each other and intertwined to such an extent that the Legislature was justified in including the Transit Authority as a "covered organization” in devising an emergency plan to solve the fiscal crisis in the city. Thus, under the police powers of the State, the wage freeze for Transit Authority employees serves a paramount public purpose and is properly directed toward the alleviation of the emergency with which we are now confronted.
In including the employees of the Transit Authority, the Legislature did not go beyond the scope needed to fulfill the objectives of the Financial Emergency Act, but merely spread the burden over a larger group of public employees. The savings generated by the wage freeze of Transit Authority and other government employees may be used to reduce the financial hardship of the municipal government. In particular, the city and State may be able to reduce the amount of the funds which they currently advance to the Transit Authority for both capital construction and operating subsidies.
The claimed violation of section 7 of article V of the New York Constitution involves an alleged impairment of contractual retirement benefits.
In Birnbaum v New York State Teachers Retirement System (5 NY2d 1), the court stated (p 11): "The constitutional *701 amendment * * * prohibits official action during a public employment membership in a retirement system which adversely affects the amount of the retirement benefits payable to the members on retirement under laws and conditions existing at the time of his entrance into retirement system membership.”
While it has been recognized that "An employee’s rate of compensation is the most significant part of the formula for determining retirement allowances” (Kleinfeldt v New York City Employees’ Retirement System, 36 NY2d 95, 100), it cannot be said that section 7 of article V of the New York Constitution prohibits the diminution of an employee’s salary where the formula for computing his pension remains consistent (Hoar v City of Yonkers, 295 NY 274; Doyle v Wright, 201 Misc 884).
The matter of the legislative intent behind the inclusion of the Transit Authority as a "covered organization” for the purpose of the wage freeze contained in the Financial Emergency Act is not subject to the court’s interpretation. The statute is not ambiguous. The Legislature, in its wisdom, specifically included the New York City Transit Authority as one of the agencies covered. The fact that petitioner contends that some members of the Legislature did not understand this to be the case is of no consequence.
Petitioner’s claim of discrimination and lack of equal protection of the law does not involve the Financial Emergency Act itself, but, rather, the implementation thereof. The act (§ 10, subd 2) provides that the wage freeze shall not apply to any employees who have agreed either individually or through their union to defer increases which the statute seeks to freeze. It has been established that many, if not all, of the unions representing employees covered by the wage freeze have been offered the option of agreeing to a wage increase deferment. The benefits of such a deferment are that the money lost will eventually be repaid and that for pension purposes the increases are included in the base salary.
No such agreement was offered to petitioner. To refuse to enter into such an agreement with petitioner under the same terms as others in its class would be an unlawful discrimination. It is incumbent upon the respondent to take such steps as are necessary to arrange for the availability of a wage deferment agreement similar to those previously accepted by the Mayor or the Emergency Finance Control Board (see *702 Patrolmen’s Benevolent Assn. v City of New York, NYLJ, Dec. 31, 1975, p 8, col 2, supra).
Accordingly, it is declared that the wage freeze provisions of the New York State Financial Emergency Act for the City of New York are not in violation of section 10 of article I of the United States Constitution, nor in violation of section 7 of article V of the New York Constitution. The application for relief is granted only to the extent of directing respondent to make available to petitioner a wage deferment agreement as heretofore set forth. All other requested relief is denied.