Per Curiam.

This case deals with the powers of centralized court administration under the unified court system, as these powers relate to the extent and manner in which the nonjudicial personnel staffing of the courts may be decreased; and, also, whether the positions of personal assistant to Supreme Court Justices and Civil Court Judges in the City of New York may properly be eliminated through the budget process.
Funding of the courts in the First Judicial Department is the responsibility of the City of New York. In May, 1975, responding to a situation rapidly building toward a financial crisis, the Mayor requested of the courts an austerity budget for fiscal 1975-1976 which began on July 1, and also requested an alternative crisis budget. In late May the Mayor submitted his executive budget to the board of estimate and the city council. This budget took the form of lump sum appropriations for the various city departments, including the courts, although line item schedules accompanied each lump sum request. These schedules were for informational purposes only since, under chapter 6 of the City Charter, the city council and board of estimate approve lump sums and not line items.
The Office of Court Administration, through its Administrative Judge, duly prepared an austerity budget as well as an alternative crisis budget. In neither were Civil Court law secretaries nor Supreme Court confidential attendants positions eliminated. In late June the city council and board of estimate adopted a budget different from that submitted by the Mayor apparently because of previous over-optimistic predictions as to additional revenues. In fact, it developed that even the crisis level budget prepared by the Administrative Judge proved to be too large in light of the city’s rapidly deteriorating financial plight. A combined cut for the Supreme Court and Civil Court of approximately six million dollars was reflected in the first proposed crisis budget. By mid-October, the Administrative Judge, at the Mayor’s request, was further asked to reduce his budget by an additional 7.35 million dollars.
Meanwhile, during the summer, amounts considered available to the courts were raised and lowered as the confused revenue outlook brightened or dimmed. The Office of Court Administration, after consultation with the Presiding Justices of the Appellate Division of the First and Second Judicial Departments, drafted a new program in response to the building financial squeeze which contained, inter alia, the elimina *355 tion of confidential attendant positions in the Supreme Court and law secretary positions in the Civil Court. The law secretaries were to be replaced by a pool of 60 law assistants (later reduced to 40), and services performed by the confidential attendants were to be accounted for in other, less expensive ways. This new program was forwarded to the Mayor along with a message expressing, in essence, that this was the least onerous of alternatives available, and that the city council and board of estimate should understand and be aware of where these cuts were being made since, under section 222 of the Judiciary Law, a legislative final determination is necessary in order to eliminate personal assistants to Judges or Justices.
These proposals drew opposition from the committee on finance to the city council and the council adopted the committee’s report. Nevertheless, the city council and board of estimate approved the total dollar amount of the court budget as submitted by the Administrative Judge. Shortly thereafter, because the anticipated additional revenues were not forthcoming, the Office of Court Administration was advised that it would be required to cut an additional one million dollars from its budget.
At this point, the New York State Legislature met in special session and passed the New York City Financial Emergency Act (L 1975, chs 868-870, eff in substantial part Sept. 1, 1975). Section 1 of the act states at great length the Legislature’s findings and purpose. The following language therefrom is significant: "This situation is a disaster and creates a state of emergency. To end this disaster, to bring the emergency under control and to respond to the overriding state concern described above, the state must undertake an extraordinary exercise of its police and emergency powers under the state constitution, and exercise controls and supervision over the financial affairs of the city of New York, but in a manner intended to preserve the ability of city officials to determine programs and expenditure priorities within available financial resources.” Section 8 of the act mandated that a financial plan be developed by the city and submitted to the newly created New York State Financial Control Board. Among other objectives, the plan is to achieve a balanced budget for the city’s 1977-1978 fiscal year (§ 8, subd 1, par a).
The Mayor, in formulating this required financial plan, informed the Office of Court Administration that, as before noted, its cuts would have to be more than doubled. The Office *356 of Court Administration in mid-October prepared new program cuts which carried the reductions already made with respect to law secretaries and confidential attendants. The Mayor, however, actually submitted a plan which reduced the courts’ budget by 7.35 million dollars.
By resolution adopted September 16, 1975 the Administrative Board directed that the confidential attendant and law secretary positions be abolished, determining that the closing of court parts would be more detrimental than the elimination of these positions. By letters dated October 27 and November 5, the law secretaries and confidential attendants respectively were notified of the termination of their employment.
By mid-November four article 78 proceedings had been commenced challenging these cuts. The two on behalf of the Civil Court law secretaries were brought by the Civil Court Judges and the law secretaries respectively and were consolidated. The two on behalf of the confidential attendants were brouht by the Supreme Court Justices and the Confidential Attendants Association of the Supreme Court and were also consolidated. In both consolidated proceedings the petitioners were successful and these determinations were made on the ground that section 222 of the Judiciary Law required the continued existence of confidential assistants to Judges and Justices.[1]
All four proceedings were then consolidated for appeal purposes and transferred to the Appellate Division, Third Department. That court unanimously reversed the lower courts’ holdings and found that the personnel cuts had been properly made. The court held, in effect, that section 222 of the Judiciary Law, made the personal assistants’ positions subject to the will of the appropriating bodies which in these cases had determined to discontinue them as indicated by the acceptance and passage of the budget request which eliminated them. It was also held that the procedures used in the budget process were proper and that there was no arbitrari *357 ness on the part of the Administrative Board in eliminating the positions.
Petitioners argue that the Administrative Judge utilized power that he does not possess; that neither he nor the Administrative Board can eliminate statutorily created positions unilaterally and that such was the nature of the process here employed since the appropriating authority never specifically consented to these reductions. They also assert that even if it can be said that the board and the city Legislature did follow appropriate budget-making procedures, their combined act could not serve to eliminate permanent positions which had become a part of the State judicial system under the Judiciary Law.
Both sides attempt to aid the resolution of this problem with certain amounts of dicta from other cases, but most aspects of this case are sui generis. We must approach the problem by examining the constitutional revision in 1962 which created the unified court system and centralized administrative control in the Administrative Board of the Judicial Conference (NY Const, art VI, § 28). In aid of this administrative control, section 211 of the Judiciary Law provides for the designation of a State administrator, or an Administrative Judge, among whose many tasks is to advise and assist both the Administrative Board and the Appellate Divisions in developing and implementing policies, standards, plans and programs (Judiciary Law, § 211, subd 2, pars [d], [e]); and section 212 lodges with the Administrative Board the power to deal with all personnel matters and practices of the courts, and to manage the fiscal practices of the courts and supervise the form, preparation and submission of budget estimates (§ 212, subds 1, 2, 8). Beyond that, and with connection to the problems in this case, the present Administrative Judge was officially designated on February 6, 1974 by the Appellate Division, First Department, as "Administrative Judge for the First Judicial Department with the responsibility of overseeing the New York City Administrative Judge, in consultation with this Court and its Presiding Justice and in accordance with the standards and administrative policies established by the Administrative Board of the Judicial Conference.”
With respect to the financial needs of the unified court system the Constitution provides in pertinent part: "Insofar as the expense of the . courts * * * is borne by * * * the city of New York * * * the final determination of the itemized esti *358 mates of the annual financial needs of the courts shall be made by the appropriate governing bodies of * * * the city of New York” (NY Const, art VI, § 29, subd d).
We thus find the courts, through the Administrative Board, Appellate Divisions and the Administrative Judge, responsible for policy in broad and sweeping fashion, and the purse strings held by the legislative branch. This is not unusual. The same state of affairs obtains between the legislative branch and the executive branch. It cannot be gainsaid that the legislative branch has a certain amount of control over judicial and executive programs because of the appropriation power. This is not a case, however, where the legislative body acting unilaterally has attempted to nullify court positions or programs by refusing to fund them (see Matter of McCoy v Mayor of City of N. Y., 73 Misc 2d 508, mod on other grounds 41 AD2d 929). Here, the appropriating body acceded to the budget request submitted by the recommending authority, the Administrative Board, and passed the lump sum appropriation sought. Certainly both the board and city council were not happy with these cuts as reflected in the accompanying schedules. Expressions of dissatisfaction and distaste over the mater were voiced by both bodies. Nevertheless, those cuts were embodied in an appropriation request which was passed. In the context of the budget process this was a final determination as contemplated under section 222 of the Judiciary Law. And, while it is true that the Administrative Judge stands on the asserted legality of the position cuts as of mid-July without regard to the subsequent declaration of emergency by the State Legislature, we are compelled to consider this budgetary process in light of the total situation in the summer of 1975 characterized by the Legislature on September 1 as being disastrous and calling for extraordinary police and emergency powers. In such circumstances it is enough that statutory requirements were substantially complied with. In sum, we find that the budgetary process as concerns this matter was properly conducted. The Administrative Board exercised the power it clearly has under the Constitution and Judiciary Law of ascertaining and mandating needs and priorities as respects court programs and personnel. The legislative branch is not constitutionally charged with making such judgments, nor does any statute purport to confer such administrative powers. Here, where the condition of the public treasury was and is such as to leave no alternative but to make drastic cuts, the *359 decision where and how such cuts should be made clearly lies with the Administrative Board and Administrative Judge under the Constitution and Judiciary Law, most particularly under section 222 thereof which specifically states with respect to the appointment of Judges’ assistants that such will be made "in accordance with the standards and administrative policies adopted by the administrative board” (emphasis added).
Having established the respective roles and powers of the legislative body and the courts, it is necessary to consider petitioners’ argument that neither body, whether unilaterally or with co-operation, can abolish positions otherwise created by the State Legislature in the Judiciary Law. Section 166 of the Judiciary Law provides in pertinent part that "[e]ach of the justices of the supreme court in the first judicial district shall appoint and at pleasure remove four attendants upon the court.” This 1909 statute is augmented by section 107 which states that the duties of a confidential attendant are to be determined by his appointing Justice, and by sections 168 and 169 which provide for the continuation in office of the confidential attendant notwithstanding the death or retirement of the Justice. It is argued that section 166 was a creation by the Legislature of the confidential attendants’ positions and that section 222, enacted in 1962 commensurate with the constitutional creation of the unified court system, must be read in light of that antecedent provision and others relating to Civil Court attendants.[2] Thus, the first part of section 222 states: "Wherever, under the provisions of any law heretofore adopted, a judge or justice of the unified court system is authorized to appoint personal assistants * * * the power of such judge or justice to make such appointments shall continue”. It is thus argued that the prior legislative creation of these positions is perpetuated, not only by the fact that section 166 is still an effective controlling statute, but also because there is a clear and current expression of legislative intent that this state of affairs shall continue; and what is more it is urged by the petitioners, this court has already pronounced the inviolability of the Trial Judges’ control of these positions in Matter of Gilligan v Procaccino (27 NY2d 162).
*360 Whatever the effect of section 166 and its counterparts may have been, even when taken together with the first part of section 222, we are constrained by the latter portion of section 222 to reject petitioners’ contentions. The Judges’ and Justices’ appointing power under previous provisions of the law is made expressly dependent in section 222 on "the standards and administrative policies adopted by the administrative board pursuant to the provisions of section two hundred twelve of this chapter and subject to the final determination of budgets by appropriating bodies as provided in section twenty-nine of article six of the constitution.” Petitioners argue that these limitations refer only to the amount of salaries and fringe benefits allocated to these positions and do not authorize complete abolition of the positions. This construction, however, does not take into account the sweeping constitutional and statutory changes wrought in the creation of the unified court system which centralized court administration and policy making. To effectuate this concept it could hardly have been the legislative intent that the Administrative Board would be powerless, irrespective of a financial crisis, to reorder, cut down or cut out nonjudicial jobs.[3] Rather, new article 7-A of the Judiciary Law is infused with the idea of *361 centralized control and authority and in section 222 thereof the power to appoint personal assistants is made expressly subject to such control.
This interpretation does not render section 222 meaningless as petitioners contend. That provision continues to allow Judges and Justices to appoint—to designate or to choose personnel agreeable to them. If, in fact, a vacancy is available to be filled, or salaries are to be raised or lowered according to a particular appropriation which lodges discretion with the "appointing authority”, then the Judges and Justices can properly act. That was the extent of our holding in Matter of Gilligan v Procaccino (27 NY2d 162, supra), where it was decided that as to such discretionary authorization regarding salaries the "appointing authority” under section 222 was the Judges and Justices and not the Appellate Divisions. Nothing in that decision indicates that the Judges can do more than deal with personnel under section 222.
The Legislature evidently saw the need to allow individual Judges, rather than the central agency, the authority to select personal assistants who would be compatible and trustworthy. "The power to appoint to a position is to be distinguished from the power to create that position.” (Ander v Dibble, 236 App Div 613, 614.) That statement is apropos here where a realistic appraisal of the appointing power is necessary. The Trial Judges may surely appoint personal assistants so long as positions are in existence. It would thwart the overriding intent and purpose of the unified court system, however, to say that the Judges could abolish, change or alter these positions under the appointing authority. Such changes are matters of policy, in this case budget policy, clearly left to authorized centralized administration. To construe section 222 in the manner urged by petitioners would violate the intent behind the constitutional changes and article 7-A of the Judiciary Law, and would lead to impossible results. Here, for instance, in the face of an emergency financial situation where the courts are mandated drastically to cut expenditures, an interpretation that dictates preservation of these positions could necessitate alternative and even more disastrous dismantling of the court system. The Administrative Board has been given the power to submit a budget which', as here, adopts the least of several evils. And the appropriating authority, reluctant though it may have been, finally deter *362 mined (as that, section 222 term must be construed in light of the New York City budgetary process) also to adopt it.
We find no merit in other arguments advanced. The Administrative Judge’s argument that the Supreme Court Justices lack standing is academic in view of the fact that the issues they raise are also presented by the Confidential Attendants Association; and the argument that the personal assistants’ due process rights were abridged because they were dismissed from public employment without a hearing (Goss v Lopez, 419 US 565; Arnett v Kennedy, 416 US 134) is not appropriate here where discharges are not for cause, but, rather, are necessitated by program cuts due to budget restrictions.
Accordingly, the orders of the Appellate Division should be affirmed.

. Section 222 states: "Personal assistants to judge or justice. Wherever, under the provisions of any law heretofore adopted, a judge or justice of the unified court system is authorized to appoint personal assistants to render to him legal or clerical services, the power of such judge or justice to make such appointments shall continue, notwithstanding the provisions of section two hundred fourteen of this chapter, in accordance with the standards and administrative policies adopted by the administrative board pursuant to the provisions of section two hundred twelve of this chapter and subject to the final determination of budgets by appropriating bodies as provided in section twenty-nine of article six of the constitution.”

. Former New York City Municipal Court Code (§ 7-a, subd 9) and former New York City Court Act (§ 8) contained similar provisions as regards Civil Court attendants.

. Resort to the Report of the Joint Legislative Committee On Court Reorganization (McKinney’s 1962 Session Laws of the State of New York, pp 3412-3418) discloses that "The new Judiciary Article gives the courts the power to end this archaic autonomy and provide, instead, effective administration, in two ways: (1) by bringing into the new unified court system all the courts in the state; (2) by giving to the courts the power to administer themselves in such a way that a fully integrated court system will come into being. The Legislature has the responsibility * * * to implement the new Judiciary Article in such a way that the courts will have the fullest power and flexibility to accomplish the goal of unification” (p 3414). Again, at page 3415, "The Committee is of the opinion that the new court system can more surely benefit from this impressive grant of administrative powers if the proposed legislation is enacted. The lines of administrative authority and the basic administrative powers should be unequivocal.” Finally, at page 3416, "All of the strong powers of self-administration given to the courts by the new constitutional amendment are permitted to be used 'only in accordance with the standards and policies adopted by the administrative board.’ * * * Clear specification of authority is a prime necessity in any effective administrative organization. The proposed legislation accordingly defines the principal administrative powers but gives to the Administrative Board full authority to prescribe how and to what extent such powers shall be exercised. Here again the aim and design of the Committee’s proposals are to grant power to the courts for self-administration, full and flexible. * * * A judge who is authorized under existing law to appoint personal assistants to render to him legal or clerical services, will continue to have that power under the proposed appended legislation, subject only to the Administrative Board’s standards and policies and to the budgetary powers of appropriating bodies.”