Eli Wager, J.
The plaintiff, Nassau Chapter, Civil Service Employees Association, Inc. (CSEA), the exclusive negotiating agent for approximately 14,000 employees of the County of Nassau (county) sues to recover damages on behalf of certain of its members whom it alleges have been harmed by the county’s violation of the collective bargaining agreement (the contract) entered into by and between the parties and of the ordinance adopted by the defendant county, enacting pertinent portions of the contract into local law.
On or about June 27, 1973 the county and the CSEA entered into the current labor contract covering the terms and conditions of employment of all employees of the county within the collective bargaining unit for the period commencing January 1, 1973 through and including December 31, 1974. The contract continued in effect many of the terms and provisions of prior labor contracts between the parties and more specifically the "graded service salary plan” (the plan) which was enacted into local law as the same was thereafter amended from time to time.
The graded service salary plan is a device adopted by the defendant municipality to clearly define the obligations of the employer to the employee relative to compensation. The adoption of such a plan establishes stability, prevents unlawful discrimination in compensation between county employees of equal rank and tenure and is designed to promote that kind of security and uniformity which is consistent with the aims of a public employer and its employees. The existence of a published scale of wages creates order within the employment structure that promotes long-term employment in that it secures to the employee stated rights and benefits. It also enables the municipal government to determine in advance, and to plan for, the cost of government with respect to employees’ salaries and other compensation.
Accordingly, the 1973 contract took account of the plan and its benefits for employer and employee and continued the same for the two-year term of that contract. Among the benefits accorded to the members of the CSEA under the plan are stated annual increments known as "step increments”. A *291 step increment is a predetermined raise in salary which every employee receives automatically with the passage of time. In this case, the step increments are paid to employees annually for the first five years of employment on the first day of January of each new year and on the first day of January of the 11th year and the 16th year of employment. Step increments accrue to county employees as supplements to any negotiated increase in the graded service salary plan made in the contract and renewals of the contract between the parties.
Step increments are provided under the graded service salary plan to all employees of the county who are in the employ of the county on January 1 of each year. The specific contractual provision (Schedule "E”, § 2) reads as follows:
"Section 2. * * * (T)here shall be five annual increments up to and including step 6. The first of such annual increments shall take effect January 1st following the commencement of service, and succeeding increments shall become effective on January 1st of each succeeding calendar year * * * A longevity increment shall be paid to any employee who has served in his grade or position for five (5) years after having attained step 6 of his salary grade. The longevity increment shall be step 7 as set forth in the attached Exhibit 2.
"An employee who has been in the same or a comparable position without being promoted or appointed to a higher position in the County service for a period of fifteen (15) years of continuous service, and is in the longevity step (7th step) of his current grade, shall receive a second longevity increment equal to the increment he would have received if he were moving into the longevity step (7th step) from the 6th step.”
I
The annual budget of the County of Nassau is prepared on a calendar year basis. Hence, the process of making the budget for the succeeding calendar year commences in the fall of the preceding year. Department heads submit budget requests for their respective departments to the County Executive and his fiscal advisers. Attempts are made to prune or to supplement department budget proposals in an effort to meet fiscal and program requirements.
In the latter part of 1974 the county’s fiscal experts advised County Executive Ralph G. Caso that economic conditions together with other governmental problems caused them to *292 forecast a $4,000,000 budget deficit carried forward into 1975. Apparently, the County Executive, looking forward to a substantial rise in the budget for 1975 and the accompanying need to levy a correspondingly substantial tax increase, directed administrative department heads to suspend the payment of annual step increments in salary to all county employees earning in excess of $25,000 per annum. It was stipulated at the trial that there were then approximately 45 employees in number out of the 14,000 in the CSEA who exceeded $25,000 per annum. Thus, they were the only persons affected by this proposal.
The direction of the County Executive to his department heads was by way of oral suggestion, not by written directive. However, to a man, each of the administrative heads of the various departments of the county exercised a prerogative apparently accorded to them in the contract and promptly notified the County Executive, the affected employees and the Nassau County Civil Service Commission that the increments due on January 1, 1975 would not be paid. The specific contractual provision, relative to notice of disapproval was meticulously complied with. In pertinent part (Schedule "E”, § 2) the contract reads as follows: "All annual increments shall be granted unless the head of the department notifies in writing the County Executive, the employee and the Nassau County Civil Service Commission that he disapproves the granting of any increment”.
It is evident, since only 45 employees out of 14,000 were affected, and since the step increment is but a minor adjustment in annual salary, that the amount of moneys involved was not substantial. The parties refused to stipulate for the record at the trial the actual sum involved but the court must take notice of its inconsequential relationship to the total county budget.
Clearly, the intention of the County Executive was to make a public demonstration of "belt tightening” in the county government in an effort to secure public support for the inevitable increase in taxes by imposing a "wage freeze” on the "fat cats” on the public payroll. The denial of increments was repeated in 1975 for 1976, so that an estimated 80 to 90 employees are affected.
II
There was testimony to the effect that in earlier contracts *293 the automatic annual step increment was barred in the first year of employment unless the erpployee "came aboard” prior to September 1 of the preceding year. Thus, more than four months of employment was then required to merit the first annual step increment on the following New Year’s Day. That qualifying period however, does not appear in the 1973 version of the contract and was bargained away in 1969 (Nassau County Ordinance No. 270-1969, amdg Ordinance No. 175-1967).
At least one of the department heads, in this case the Commissioner of Social Services, determined on his own initiative to withhold the annual step increment from a number of county employees on January 1, 1975, who had been in the employ of the Social Services Department for less than one month prior to that date. The unrefuted testimony of the CSEA president was to the effect that prior to 1974, there were employees hired for a period of one or more days prior to New Year’s Day, who received the annual step increment almost immediately thereafter. The action of the Social Services Commissioner in suspending the annual step increment for the employees under his supervision appears to have been without the direction of the County Executive, and was ostensibly his contribution to fiscal restraint and integrity in a time of crisis. The denial of increments to newly acquired employees in Social Services, approximately 20 in number, was repeated in 1975 for 1976, so that approximately 50 employees are affected.
Ill
Prior to the commencement of this action, the CSEA filed an improper practice proceeding against the county with the State Public Employment Relations Board (PERB) charging that the county, by its conduct, violated the Public Employees Fair Employment Act (Civil Service Law, § 209-a, subd 1, pars [a], [d]; "Taylor Law”) by failing to pay the increments due on January 1, 1975. The issues considered in the PERB proceeding were identical to those before this court, except for the fact that they dealt only with the alleged violations in 1975.
The PERB Hearing Officer concluded that the county did indeed violate the Taylor Law (Civil Service Law, § 209-a, subd 1, par [d]) "* * * when it unilaterally determined to withhold increments to employees earning in excess of $25,000. per annum or who were hired after November 30, 1974, notwith *294 standing the giving of notice thereof to such employees. The County should have paid the increments to those employees eligible for them and obtained CSEA’s agreement to any change in the incremental system prior to unilaterally acting.” The Hearing Officer absolved the county of a violation of paragraph (a) (Civil Sevice Law, § 209-a, subd 1) in that he found no motivation on the part of the county to deprive the employees of their rights under section 202 of the Civil Service Law, holding that such an intent is a prerequisite to finding a violation of that section.
Notwithstanding the findings of the hearing officer, PERB’s jurisdiction in the proceeding was limited to a direction that the parties negotiate the issues involved in good faith. (Matter of Jefferson County Board of Supervisors v New York State Public Employment Relations Bd., 36 NY2d 534). The hearing officer did issue such a direction. Apparently, negotiations have either not been undertaken or have not been successful since the acts complained of were repeated by the county for January 1, 1976. Hence, this lawsuit.
IV
During the trial of this action, the CSEA offered into evidence a letter dated March 1, 1972 jointly executed by the Deputy County Executive for Fiscal Administration and the president of CSEA which was, in effect, a submission to the Federal Cost of Living Council. By that document the parties to this lawsuit stipulated to the meaning and effect of the graded service salary plan, saying as follows: "While it appears from the ordinance that there is some discretion in a department head to withhold a scheduled increment, in actual practice the annual increments as set forth in the plan have rarely, if ever, been withheld. Neither the County nor the CSEA have treated the plan as a 'merit plan.’ There is no requirement in Nassau County that employees be rated periodically. Some departments follow a rating procedure on an informal basis. The salary increases set forth in the plan are never referred to as anything but automatic annual increments or longevity increases. In this regard, there are only two prerequisites for an employee to receive the scheduled increases:
"a) That he is in the position on January 1 of any given year, and
"b) the employee’s performance is satisfactory”.
*295 The purpose of the submission made by the contracting parties was to obtain the Federal Pay Board’s exemption of the county’s labor contract from Federal wage controls then in existence. The interpretation of the contract by the parties themselves, as respects annual increments, is most revealing and persuasive.
Testimony offered by the president of CSEA was to the effect that in few cases had a department head given notice of an intention to withhold the increment from individual employees and then only on a claim of unsatisfactory performance or misconduct. Those cases became the subject of individual grievance proceedings under the contract. Some increments were reinstated while the denial of others was upheld. It must be stressed that the contract is silent as to a basis for the withholding but the parties themselves have by past practice interpreted the contract so as to allow the employer to withhold the increment from an employee for cause.
At bar, no claim is made by the county of any misfeasance or nonfeasance by any of the affected employees. The sole basis for the county’s action was fiscal restraint as has heretofore been stated. It, therefore, becomes material and necessary to examine the reasonableness and the legality of the county’s action in the light of the circumstances and of the classification made.
V
Each of the parties has urged upon the court its own view of the contract and ordinance as applied to the facts of this case. The CSEA asserts the sanctity of the contract and that the past practice of the parties in relationship to step increments in particular, has been incorporated into the contract and made an inviolate part thereof.
The county submits that in a time of fiscal emergency, rights of contract, even of municipal employees, must be subordinated to the greater good of the municipality. The county cites, in support of its position, recent decisions obtained in the City of New York as a result of the fiscal crisis of 1975 and argues that certain judicial relief accorded to the City of New York is applicable to the County of Nassau in the strained financial circumstances of 1975 and 1976.
This court is persuaded that there is more at issue here than a simple violation of contract or the expedient action by *296 a public employer to avoid fiscal calamity. The contractual and constitutional aspects of the county’s action in this case bear scrutiny and review and are the basis on which this case must be decided.
A. Contractual Interpretation. The contract must be interpreted "according to its natural and most obvious sense, without resorting to an artificial or forced construction” (McKinney’s Cons Laws of NY, Book 1, Statutes, § 94) in accord with its "object, spirit and purpose” (McKinney’s Cons Laws of NY, Book 1, Statutes, § 96). Usage and custom may also be considered (McKinney’s Cons Laws of NY, Book 1, Statutes, § 127).
The discretion accorded to the heads of the county departments as to the withholding of step increments must be interpreted according to the afore-mentioned rules. Past practices of the parties as indicated in the jointly executed letter to the Cost of Living Council, are most convincing as an admission against interest. The interpretation given to the clause by the county and the CSEA in prior years is the most "natural” interpretation in light of the "object, spirit and purpose” of the collective bargaining agreement. Thus, "(T)here are only two requisites for an employee to receive the scheduled increases: a) that he is in the position on January 1st of any given year; and b) the employee’s performance is satisfactory.”
B. Legislative Action in Fiscal Emergencies. It is the county’s contention that the government’s fiscal emergency is sufficient cause for the county’s actions. "The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate”. (Steelworkers v Warrior & Gulf Co., 363 US 574, 578; see also, Williston on Contracts [3d ed], §§ 1020A, 1020B.)
Surely the draftsmen of the contract here in question did not anticipate the advent of escalating inflation, a diminishing tax base, rising cost of services and all the other afflictions of today’s municipal governments. With the onset of such crises, although no doubt remains as to the status of the contract, the public interest becomes superimposed upon the contract. In the New York City emergency, the State Legislature responded with the Financial Emergency Act. In the County of Nassau, absent such legislation, we must construe the con *297 tract in accordance with appropriate public interest considerations.
Section 2-a of the New York State Financial Emergency Act for the City of New York (L 1975, ch 868, § 2, amd L 1975, ch 870) declared a finding by the Legislature that a "state of financial emergency exists within the city”. The most drastic controls were imposed upon the entire city for the purpose of avoiding default on city obligations and bankruptcy. The legislative findings and statement of purposes contained in section 1 of chapter 868 of the Laws of 1975 detailed the impending disaster as perceived by the Legislature and the intention of the Legislature to "insure the continuity of government operations in the city and to provide the means by which the present emergency can be in time overcome*’.
Among other emergency provisions of the statute (L 1975, ch 868, § 2, amd L 1975, ch 870, § 11), section 10 thereof provided that "Increases in salary or wages of employees of the city and employees of covered organizations * * * pursuant to collective bargaining agreements or other analogous contracts now in existence or hereafter entered into, requiring such salary increases * * * are hereby suspended. All increased payments for holiday and vacation differentials, shift differentials, salary adjustments according to plan and step-ups or increments for employees of the city and employees of covered organizations * * * are hereby, in the same manner, suspended”.
The county cites Committee of Interns and Residents v City of New York (87 Misc 2d 504) and Matter of Subway-Surface Supervisors Assn. v New York City Tr. Auth. (85 Misc 2d 695) in support of their position. Both cases were tests of the city’s power to suspend increases in salary and wages provided under collective bargaining agreements existing at the time the Financial Emergency Act was adopted. The suspension of all wage increases by legislative enactment was held to be a reasonable exercise of the State’s police power and further, that the suspension of benefits due to all the city’s employees did not impair their collective bargaining agreement (Home Bldg and Loan Assn. v Blaisdell, 290 US 398). In brief, the statute was upheld as a valid approach by the Legislature to an otherwise unmanageable situation, permissible in a time of extreme emergency.
The county’s attempt to associate itself with the city’s emergency for the sake of justifying its actions against a *298 handful of employees cannot be sustained. Here, there was no legislated declared emergency, merely an apprehension, albeit justified, by the Chief Executive of the county of- an impending budget deficit and the anticipated tax increase to flow therefrom. The action taken was administrative in nature and directed only against a specific group of employees, no more than 150 out of 14,000.
C. Equal Protection of the Laws in Administrative Action.
"No state shall make or enforce any law which shall * * * deny to any person within its jurisdiction the equal protection of the laws.” (US Const, 14th Arndt, § 1.)
The selection of affected employees in this case was made by the administrative heads of the county government and not by the Board of Supervisors. Such administrative actions are subject to the Equal Protection Clauses of the United States and New York State Constitutions (Matter of Abrams v Bronstein, 33 NY2d 488).
In selecting the employees to be affected by the actions of the executive, two standards were applied: high income (over $25,000) and, in the case of the Department of Social Services, late hirings (less than one month).
When a classification is made as between persons who are or should be treated equally under the law, the court must inquire into the reasonableness of such classification (US Const, 14th Arndt, NY Const, art 1, §11). '"Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.’ (Baxstrom v Herold, 383 US 197, 111.) Nor is the Constitution offended if the classification has some reasonable or rational basis. (Dandridge v Williams; 397 US 471, 485; see also, Matter of Stracquadanio v Department of Health, 285 NY 93.) Furthermore, '[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.’ (McGowan v Maryland, 366 US 420, 426.)” (People v Ditniak, 28 NY2d 74, 78; see also, Abrams v Bronstein, 33 NY2d 488, supra.)
Classifications between equals must be relevant to the achievement of the State’s objectives. (McGowan v Maryland supra.) The classification must be reasonable and not arbitrary, related fairly to the result sought to be obtained and must treat all persons in similar circumstances equally. 'Mere *299 difference is not enough”. (Louisville Gas Co. v Coleman, 277 US 32, 37.)
Arbitrary and unjustified discrimination violates the Constitution when certain individuals of a class are selected by government for treatment distinctly different and oppressive as opposed to others of the same class. (People ex rel. Farrington v Mensching, 187 NY 8, 21, 22; People v Kraushaar, 195 Misc 487; Russo v Morgan, 174 Misc 1013.)
"The constitutional requirement of the equal protection of the law undoubtedly permits a wide range of discretion in classifying both persons and things, and the requirement is not violated so long as persons and things similarly situated are similarly treated.” (Russo v Morgan, supra, p 1017.)
The classifications at bar, clearly violated constitutional guidelines. They are arbitrary and do not bear any reasonable relationship to the purposes put forth by the county. It is impossible to conceptualize that the withholding of the step increments alone of 1% of the labor force would do much to decrease a $4,000,000 budget deficit. Had there been evidence of State legislative action declaring a financial emergency in Nassau County followed by local legislative enactments setting forth a plan aimed at reducing or eliminating this deficit, these classifications may have passed muster. Absent the above, the actions of the county department heads are merely a haphazard effort, unreasonable in its design and utterly without merit to accomplish the stated purpose.
D. Contract Clause.
"No state shall * * * pass any * * * law impairing the obligation of contracts”. (US Const, art 1, § 10, cl 1.)
The county urges upon the court that a governmental unit may temporarily impair contract rights in times of an emergency if the restraints are reasonable and in the public interest (Home Bldg, and Loan Assn. v Blaisdell, 290 US 398). Several recent cases have been brought to the court’s attention wherein the contract rights of governmental employees have been impaired. Three cases involved the New York City Financial Emergency Act (Committee of Interns and Residents v City of New York, supra; Matter of Subway-Surface Supervisors Assn. v New York City Tr. Auth., supra; Matter of Blyn v Bartlett, 39 NY2d 349). The actions of the appropriate governmental unit were authorized by the State Legislature’s declaration of a financial state of emergency in New York State. This followed the precedent set in Home Bldg and Loan Assn. *300 v Blaisdell (supra), where the State Legislature authorized a mortgage moratorium after finding that an emergency existed. These cases are distinguished from the case at bar in that there has been no finding of an emergency by the Legislature.
Other recent cases upheld a government’s power to fire employees despite a job security clause in the collective bargaining agreement (Matter of Schwab v Bowen, 51 AD2d 574; Lippmann v Delaney, 9 PERB 7507; Matter of Board of Educ. of Yonkers City School Dist. v Yonkers Federation of Teachers, 51 AD2d 568). In each of these cases the local legislative body discharged governmental employees by eliminating positions, after findings that fiscal emergencies warranted these budget-cutting measures. These cases are distinguishable from the cases at bar, since there has been no legislative action taken by the county toward this end.
VI. CONCLUSION
The administrative actions of the several department heads bf the County of Nassau in denying annual step increments to certain employees on January 1, 1975 and January 1, 1976 violated the collective bargaining agreement between the parties. The affected employees are entitled to recover the moneys withheld. Accordingly, the court finds for the plaintiff, Civil Service Employees Association.