MORTON WEISSMAN et al., Individually and on Behalf of All Others Similarly Situated, Appellants, v JOSEPH W. BELLACOSA, as Chief Administrator of the Courts, and as Representative of the Administrative Board of the Judicial Conference of the State of New York, et al., Respondents.

Second Department, June 29, 1987

## APPEARANCES OF COUNSEL

*Block & Hamburger (Frederick Block* of counsel), for appellants.

*Michael Colodner (John Eiseman* and *Barbara Zahler-Gringer* of counsel), for Joseph W. Bellacosa, respondent.

*Robert Abrams, Attorney-General (Lawrence S. Kahn* and *Abigail I. Petersen* of counsel), for Edward Regan and another, respondents.

## OPINION OF THE COURT

KOOPER, J.

The question to be resolved on appeal is whether statutorily prescribed disparities in the salaries of certain County Court Judges serving in adjoining localities comport with both Federal and State constitutional mandates guaranteeing citizens equal protection of the laws (US Const 14th Amend; NY Const, art I, § 11). For the reasons that follow, we conclude that the disparate financial treatment perpetuated by the legislation challenged at bar deprives the plaintiffs of their rights to equal protection and, accordingly, we reverse the judgment of Special Term.

Pursuant to Laws of 1979 (ch 55, § 2) the Legislature enacted a salary schedule which retroactively fixed the compensation for Judges of the State's County Courts. Judiciary Law former § 221-d (as added by L 1979, ch 55, § 2), established the operative salary schedule pursuant to which County Court Judges were compensated between the years 1979 and 1984. During these years, however, the Judges of the Nassau County Court earned a base annual salary ranging between $1,000 and $1,967 in excess of that earned by their Suffolk County colleagues. Pursuant to Judiciary Law § 221-d (as added by L 1984, ch 986, § 5), the disparity was increased to $4,000 when the salaries of Nassau and Suffolk County Court Judges were set at $82,000 and $78,000, respectively.

The plaintiffs, who are County Court Judges serving in Suffolk County, seek a judgment declaring Judiciary Law § 221-d unconstitutional under the Federal and State Constitutions as violative of their right to equal protection insofar as it

creates an unfavorable disparity between their salaries and those of their counterparts serving in Nassau County. The plaintiffs also seek a money judgment representing back wages from October 1, 1978, and set forth a cause of action under the United States Code (42 USC § 1983) pursuant to which they seek counsel fees (see, 42 USC § 1988). The plaintiffs argue that they are entitled to parity with their Nassau County colleagues and that the challenged legislation creates salary classifications which are arbitrary, capricious and bear no rational relationship to the furtherance of a legitimate State interest. We agree.

The disparate financial treatment challenged at bar had its genesis in the now-abolished system under which the salaries of judicial personnel were determined and financed, in part, by the particular locality in which they served, thus reflecting differing fiscal philosophies and limitations. The subsequent enactment of the Unified Court Budget Act (Judiciary Law § 39 [6], added as § 220 [6] by L 1976, ch 966, § 2), abolished this unwieldy system of local fiscal responsibility, implemented the State's takeover of the courts and provided that judicial personnel were to be placed on the State payroll as of April 1, 1977. Although the express purpose of the Unified Court Budget Act, as discerned from its preamble, was to "enable the allocation of moneys and manpower when needed unimpeded by artificial local boundaries and the diverse competing needs of local governmental agencies" (L 1976, ch 966, § 1), "the act nevertheless maintained the salary disparities, in both its original form (Judiciary Law § 220 [6] [a], as added by L 1976, ch 966, § 2) and in subsequent enactments and amendments" (Kendall v Evans, 126 AD2d 703, 704, appeals dismissed 69 NY2d 984; see, Judiciary Law former § 221-d, as added by L 1979, ch 55, § 2, Judiciary Law § 221-d as added by L 1984, ch 986, § 5), thereby perpetuating "precisely the kind of nonuniformity it was the avowed purpose of the act to remove" (Weissman v Evans, 56 NY2d 458, 463).

This failure to achieve parity, and thus uniformity in the salaries of judicial personnel of the same rank, occurred despite repeated recommendations by successive Chief Administrative Judges that the salary disparities be abolished (see, Weissman v Evans, supra, at 463; Kendall v Evans, supra). In the report compiled by former Chief Administrative Judge Herbert Evans concerning judicial salary disparities, it is stated that the perpetuation of such disparities is "neither necessary, desirable, nor equitable". Indeed, the affidavit sub-

mitted by former Chief Administrative Judge Joseph W. Bellacosa, although taking no position in respect of the plaintiffs' constitutional challenge, states that "as a matter of policy", the salaries of all County Court Judges in the State of New York should be equal. Accordingly, there can be no question that the perpetuation of salary disparities among judicial personnel of the same rank premised upon geographical distinction is inimical to the objectives sought to be achieved by the Unified Court Budget Act *(Weissman v Evans, supra,* at 463-464) and that the practice has been criticized by those charged with reviewing its effectiveness as a policy *(see, Kendall v Evans, supra).*

We turn now to the substantive constitutional issues implicated by the differing treatment accorded the plaintiffs and their Nassau County counterparts. The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws" (US Const, 14th Amend, § 1).[1] The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate State interest *(see, e.g., Schweiker v Wilson,* 450 US 221; *United States R. R. Retirement Bd. v Fritz,* 449 US 166, *reh denied* 450 US 960). More specifically, "[t]he test of rationality is satisfied after ascertaining 'the basis of the classification involved and the governmental objective purportedly advanced by [comparing] * * * [t]he classification * * * to the objective to determine whether the classification rests "upon some ground of difference having a fair and substantial relation" to the object for which it is proposed *(Reed* v. *Reed,* 404 U.S. 71, 76 * * *)' *(Matter of Abrams v Bronstein,* 33 NY2d 488, 492-493)" *(Kendall v Evans, supra,* at 704-705). As the Court of Appeals stated in *Weissman,* "while equal protection does not necessarily require territorial uniformity * * * '[a] territorial distinction which has no rational basis will not support a state statute' " *(Weissman v Evans, supra,* at 464-465, quoting from *Manes v Goldin,* 400 F Supp 23, 29, *affd* 423 US 1068). This court, moreover, has recently observed, in assessing a challenge to the constitutionality of salary disparities among City Court Judges that, "it is clear that the geographical distinctions

---

1. NY Constitution, article I, § 11 similarly provides that, "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof".

created by the [Unified Court Budget Act] must be predicated upon a rational basis to survive an equal protection challenge *(Cass v State of New York,* 58 NY2d 460; *Weissman v Evans,* 56 NY2d 458)" *(Kendall v Evans, supra,* at 704). Thus, in order to pass constitutional muster, the disparate financial treatment created by the legislation must rest upon "grounds of differences" fairly and substantially related to the objective for which it was proposed.

After review of the record within the context of the foregoing criteria, we conclude that there exists no rational basis for the salary classifications created by the challenged legislation. Indeed, only five years ago the Court of Appeals struck down a statute (Judiciary Law § 221-f) which provided for a disparity in the salaries of Nassau and Suffolk District Court Judges premised upon precisely the same geographical classifications drawn by the statute challenged at bar. In determining that Judiciary Law § 221-f violated the equal protection rights of the Suffolk County District Court Judges, the court, quoting from the affidavit of Lee Koppelman, Director of the Long Island Regional Planning Board, characterized the two contiguous counties as a " 'true unity of * * * judicial interest * * * indistinguishable by separate geographic considerations' " *(Weissman v Evans, supra,* at 463). We perceive no reason on this record to differ from the Court of Appeals assessment in *Weissman.*[2]

A comparison of the subject legislation's discriminatory salary schedule and the materials submitted in support of the geographical distinctions, fails to establish that the classifications drawn rest upon grounds rationally related to the advancement of a legitimate State interest. The data produced by the plaintiffs in support of their motion for summary judgment clearly demonstrate that the functions, duties and responsibilities of County Court Judges serving in Nassau and

---

2. The defendants seek to circumscribe the scope of *Weissman* by theorizing that its holding determines only that historical justifications for the perpetuation of constitutionally infirm legislation are insufficient and that the Court of Appeals statements with respect to the judicial unity of the counties were dicta. Although to be sure, the court rejected the defendants' historical inequity argument, it did so only after first determining that the plaintiffs' statistical data had established the absence of constitutionally significant distinctions between the two counties *(Weissman v Evans,* 56 NY2d 458, 463-464). That the defendants proffered no data to impeach the materials submitted by the plaintiffs or relied upon an erroneous legal theory does not lessen the dispositive impact of the court's determination in respect of the issue of judicial unity.

Suffolk Counties are identical; that, for all practical purposes, their caseloads are the same; that there is no meaningful difference in county-wide population; and that there are absent significant economic distinctions between the two contiguous counties upon which to rationally ground the salary disparity.[3]

The defendants nevertheless argue that a rational basis supporting the discriminatory legislation is discernible when certain alleged distinctions in caseload, cost of living and population are considered (*Cass v State of New York*, 58 NY2d 460, 464, *rearg denied* 60 NY2d 586). We disagree. The statistically insignificant distinctions between the two counties in these areas upon which the defendants rely merely serve to confirm the largely artificial nature of the geographical distinctions drawn by the challenged statute. For example, in terms of caseload, the average annual number of civil and criminal dispositions per Judge between the years 1978 and 1984 reveals that Suffolk County Judges disposed of an average of 248 cases per year as compared to an average of 260 disposed of by their Nassau County colleagues, a difference of only 12 dispositions. Moreover, the events which have transpired since the enactment in 1979 of the first discriminatory salary legislation (L 1979, ch 55, § 2) further undermine the contention that the 1984 legislation—which further increased disparity—is grounded upon significant distinctions in caseload. As the plaintiffs advise, Suffolk's burgeoning caseload is evidenced by the judicial "crash program" commenced in 1981 which called for the assignment of additional Judges from other counties to ease the burden placed upon Suffolk's then seven full-time County Court Judges. According to the plaintiffs, the assignment of these outside Judges had the effect of increasing Suffolk's total available County Court Judges to 13 in 1981 and 15 in 1982. Thereafter, in recognition of this increased workload, the Suffolk County Court Bench was increased in 1983 from 7 to a complement of 11 full-time Judges.

---

**3.** Although on their original motion the plaintiffs submitted certain caseload statistics supplied by the Office of Court Administration which had not been broken down into Supreme Court and County Court categories, we may nevertheless take judicial notice of the reorganized statistics as submitted by the plaintiffs in support of their motion to renew, and thus consider them in reaching our determination (*see, Mackston v State of New York*, 126 AD2d 710).

Additionally, the record reveals an absence of meaningful distinctions in terms of population and cost of living. The demographic evidence submitted establishes—and the defendants do not seriously dispute—that the population of the two counties is virtually identical. The defendants' own statistics, moreover, establish Suffolk's rapid population growth and contain projections which indicate that Suffolk will soon surpass Nassau in total population. Indeed, these same statistics reveal that between the years 1980 to 1985, the rate of Suffolk's population growth was estimated to be more than double that of Nassau's. Further review of the defendants' statistics highlights the rapid growth of Suffolk County and reinforces the impression of demographic identity reflected by the similarity in total population. For example, between 1980 and 1985: (1) Suffolk's total households increased 6.4% while Nassau's increased 2.4%; (2) Suffolk's household population increased 3.9% while Nassau's increased 1.8%; (3) Suffolk's labor force, though 81,082 less than Nassau's in 1980, was only a de minimis 17,900 less in 1985, when the estimated 1985 labor forces in Nassau and Suffolk were 738,400 and 720,500, respectively; (4) Suffolk's unemployed totaled some 5,000 more than Nassau's in 1980 but only 2,000 more in 1985; (5) Suffolk's estimated median household income, $30,062 in 1985, compares favorably with Nassau's figure of $35,390 and, moreover, between 1980 and 1985 the rate of growth in median household income was virtually identical in both counties; and (6) Nassau's total employment in 1980 numbered 625,280 and Suffolk's totaled 538,551, while in 1985, the employment figures for Nassau and Suffolk were almost indistinguishable at 703,700 and 683,800, respectively.

Although the statistics accompanying the defendants' opposition papers indicate that the average and median home value in Nassau is slightly higher than in Suffolk we note that Lee Koppelman, Executive Director of the Long Island Regional Planning Board, has stated in his supporting affidavit that these statistics "include the east end of Suffolk County, where housing prices are radically lower than the western part of Suffolk where the costs are more comparable to the cost of housing in Nassau County". Furthermore, while the defendants characterize the mean, median and average rents in Nassau County as "substantially higher" than those in Suffolk County, the record establishes average monthly rentals of $296 and $314 per month in Suffolk and Nassau respec-

tively, thus reflecting no meaningful disparity.[4] In short, the record reveals that between the years 1980 and 1985 the two counties have, if anything, grown closer in all relevant respects than they were when the *Weissman* case *(supra)* was decided by the Court of Appeals.

Moreover, the record supports the plaintiffs' contention that "[t]he more significant overview is that the totality of economic indicators have *[sic]* resulted in the joining of Nassau and Suffolk as one economic and judicial entity from at least the 1970s to the present date". As the Koppelman affidavit advises, the two counties share the same consumer price index and, since 1972, the Federal Government has treated the counties as a single Standard Metropolitan Statistical Area " 'because of the exceptional intertwining of economic and governmental interests between the two Counties' ". The Koppelman affidavit further indicates that, in 1978, the United States Department of Commerce designated Nassau and Suffolk as the first exclusively suburban Economic Development District in the Nation and in 1981 designated the counties as an Economic Development District in order to allow them to collectively establish priorities for the funding of job-related economic activities; that a Long Island Regional Planning Board established in 1965 as the Nassau-Suffolk Regional Planning Board, was created to address common issues and problems shared by the counties; and that both counties for many years have formed the State's Tenth Judicial District. Many of these very same indicia of unity were presented to the Court of Appeals in Koppelman's 1979 affidavit, from which the court in *Weissman v Evans* (56 NY2d 458, *supra)* specifically quoted in characterizing the two counties as being "indistinguishable by separate geographic considerations" *(Weissman v Evans, supra,* at 463).

In sum, the defendants' statistical information neither sup-

---

4. Although in a brief footnote, the *Weissman* court rejected the contention that the "lure of private practice" in New York City constituted a reasonable explanation for the favorable salary treatment accorded Nassau's District Court Judges *(Weissman v Evans* 56 NY2d 458, 466, n 5), the defendants have nevertheless devoted some six pages of argument to the theory, reasoning that it was their failure to submit statistical data in support of the claim which compelled the Court of Appeals to reject it. Suffice it to say that, while the *Weissman* court did note, in rejecting their "lure of private practice" argument, that the defendants had failed to support it, the court's terse remark to the effect that there is no "paucity" of candidates for the Bench in either county, reveals that it found the argument to be entirely unpersuasive.

ports their claims that significant distinctions exist between Nassau and Suffolk Counties, nor reveals the advancement of a legitimate State objective by the retention of the subject geographical distinctions, which "directly contravene the long-heralded and legislatively indorsed substitution of State for local control of the courts" *(Weissman v Evans, supra,* at 466). Accordingly, we conclude that the disparate financial treatment perpetuated by the challenged legislation is offensive to the plaintiffs' constitutionally protected right to equal protection of the laws of this State.[5]

As to the matter of the date from which the plaintiffs are entitled to receive the differential between the salaries they have been receiving and those paid to their counterparts in Nassau County, we conclude, as did the Court of Appeals in *Weissman,* that the "fixing [of] October 1, 1978 as the date from which to measure the accrual of plaintiffs' rights would accord with simple equity and fairness" *(Weissman v Evans, supra,* at 467). As the Court of Appeals in *Weissman* observed in this respect, since the Legislature, in acting upon salaries under the act in 1979, "found the time to fix salaries, even retroactively to October 1, 1978, it surely was presented with the occasion to see to it that, in the process, the parity required by the Constitution was achieved" *(Weissman v Evans, supra,* at 467).

Finally, inasmuch as the plaintiffs have been successful on their claim, which is cognizable under 42 USC § 1983, the case must be remitted to the Supreme Court, Westchester County, to afford the defendants an opportunity to demonstrate whether special circumstances exist which would bar an award of counsel fees *(see,* 42 USC § 1988) and, if not, to fix a reasonable fee in accordance with the guidelines set forth in *Matter of Rahmey v Blum* (95 AD2d 294; *see also, Matter of Johnson v Blum,* 58 NY2d 454, 458; *Matter of Carabello v*

---

**5.** Contrary to the defendants' contentions, the Court of Appeals holding in *Cass v State of New York* (58 NY2d 460) is not controlling at bar. In *Cass,* the relevant classes encompassed Judges of three separate courts established and maintained throughout the State. In rejecting the plaintiffs' equal protection challenge in *Cass,* the court noted that there were evident distinctions in caseload, population and cost of living among the wide range of counties in which the plaintiffs served, thereby establishing a rational basis for the salary disparities there challenged *(see also, Cheeseman v Bellacosa* 130 AD2d 920). The court, however, specifically distinguished *Weissman* (56 NY2d 458), stating that *Weissman* involved one class of Judges serving in two adjoining counties where differences in caseload, population and cost of living were not evident.

*Perales,* 117 AD2d 598, 602; *Perkins v Town of Huntington,* 117 AD2d 726, 727; *Matter of Aviles v D'Elia,* 97 AD2d 821).

Accordingly, the appeal from the order should be dismissed, the judgment should be reversed, the order should be vacated, the plaintiffs' motion for summary judgment should be granted, it should be declared that Judiciary Law § 221-d is unconstitutional insofar as it provides for a salary disparity between the Judges of the County Court in Nassau and Suffolk Counties, and the matter should be remitted to the Supreme Court, Westchester County, for further proceedings on the plaintiffs' claims for attorneys' fees and for entry of judgment.

MANGANO, J. P., WEINSTEIN and RUBIN, JJ., concur.

Ordered that the appeal from the order is dismissed, without costs or disbursements; and it is further,

Ordered that the judgment is reversed, on the law, without costs or disbursements; the order is vacated, the plaintiffs' motion for summary judgment is granted, and it is declared that Judiciary Law § 221-d is unconstitutional insofar as it provides for a salary disparity between the Judges of the County Court in Nassau and Suffolk Counties, and the matter is remitted to the Supreme Court, Westchester County, for further proceedings on the plaintiffs' claims for attorneys' fees and for entry of judgment.

The appeal from the intermediate order must be dismissed because the right of direct appeal therefrom terminated with the entry of judgment in the action *(see, Matter of Aho,* 39 NY2d 241, 248). The issues raised on appeal from the order are brought up for review and have been considered on the appeal from the judgment (CPLR 5501 [a] [1]).