NEW YORK CITY MANAGERIAL EMPLOYEES ASSOCIATION, George Caulfield, William H. Dworkin, John L. Hendrickson, Charles D.W. Kirnon, Philip Levine, Frank Meyer, Anthony Punzi, Thomas Sweetman, Harold Yourman, James B. McNally, Ronald L. Savitt, Mitchel Saed, Blanche Barth and Fred Ewald, on Behalf of themselves and all others similarly situated, Plaintiffs,

v.

David N. DINKINS, as Mayor of the City of New York, Elizabeth Holtzman, as Comptroller of the City of New York, the New York City Health and Hospitals Corporation, the New York City Transit Authority and the Board of Education of the City School District of the City of New York, Defendants.

No. 91 Civ. 2693 (CBM).

United States District Court, S.D. New York.

June 29, 1992.

See also 807 F.Supp. 955.

Joan Stern Kiok, New York City by Joan Stern Kiok, for plaintiffs.

Wachtell, Lipton, Rosen & Katz, New York City by Norman Redlich, Ralph M. Levene, Jeffrey I. Lang, for defendants Mayor David N. Dinkins, Comptroller Elizabeth Holtzman, the New York City Health and Hospitals Corp. and the Bd. of Educ. of the City School Dist. of the City of New York.[1]

New York City Transit Authority, Brooklyn by Albert C. Cosenza, Vice President and Gen. Counsel Kenneth Howard Schiffrin, for defendant New York City Transit Authority.

## OPINION

### SUMMARY JUDGMENT

MOTLEY, District Judge.

#### I. *Introduction*

This suit was brought by the New York City Managerial Employees Association (the "MEA") and fourteen managerial employees against the Mayor of the City of New York (the "City"), its Comptroller, the New York City Health and Hospitals Corporation (the "HHC"), the Board of Education of the City School District of the City of New York (the "BOE") and the New York City Transit Authority (the "TA"), their respective employers. Plaintiffs seek declaratory, monetary and injunctive relief from defendants' determination to impose salary freezes and cuts upon them in fiscal years 1991 and 1992. Similar salary freezes and cuts were not imposed on nonmanagerial employees who are unionized and nonunionized nonmanagerial employees who are referred to as Original Jurisdiction employees. Plaintiffs claimed

that the classifications thus created violated their rights under the Equal Protection Clauses of the Fourteenth Amendment to the Federal and New York State Constitutions. Defendants moved for summary judgment in their favor. The motion is granted for the reasons which follow.

#### II. *Factual Background*[2]

##### A. The defendants' workforces.

Defendants' workforces include three categories of employees: (1) nonmanagerial, unionized employees whose salaries are covered by collective bargaining agreements; (2) nonmanagerial, nonunionized employees whose salaries are not covered by collective bargaining (a.k.a. "Original Jurisdiction" or "OJ" employees); and (3) managerial, nonunionized employees, whose salaries are not covered by collective bargaining ("managers").[3] *See* Jenkins Aff. ¶¶ 5–6; Ryan Aff. ¶ 6; Doherty Aff. ¶ 6; Baxter Aff. ¶ 4.

New York's Taylor Act (N.Y.Civ.Serv. Law §§ 200–214 (McKinney 1992)) and the City's Collective Bargaining Law (Administrative Code §§ 12–301—12–316 (1985)) create a classification between those City employees whose salaries are determined by the Mayor (and the governing bodies of the other defendants) and those employees whose salaries are governed by the collective bargaining process. Managers are excluded from collective bargaining precisely because of their "managerial" status. OJ employees are excluded because their work involves "confidential" matters, such as

1. For purposes of clarity between these defendants and defendant New York City Transit Authority, these defendants are sometimes referred to as the "City Defendants."

2. This statement of facts is based upon affidavits submitted to the court by the parties. The City Defendants submitted affidavits from Herman L. Jenkins, Director of the City's Department of Personnel; Thomas P. Ryan, Executive Director of the Division of Human Resources of the BOE; Thomas G. Doherty, Vice President, Corporate Affairs for the HHC; Brian T. Baxter, First Deputy Comptroller of the City; Philip R. Michael, Director of the City's Office of Management and Budget; and James F. Hanley, Commissioner of the City's Office of Labor Relations. Defendant TA submitted affidavits from

Kenneth Howard Schiffrin, Assistant General Counsel for the TA; Harvey Poris, Deputy Vice President for both the Operating and Revenue Budgets of the TA; Carmen Suardy, Vice President, Labor Relations for the TA; and a reply affidavit from Mr. Schiffrin. Plaintiffs submitted affidavits from Joan Stern Kiok, plaintiffs' attorney; Harold Yourman, President of the MEA; and Jose Serrano, Claims Manager for the TA.

3. HHC has only two groups of employees: (1) Group 11 employees who are considered managerial and confidential by HHC; and (2) Group 12 employees who are in collective bargaining. New York City Health and Hospitals Corporation Act, N.Y.Unconsol.Laws §§ 7385.11 and 7385.12 (McKinney 1992).

personnel or labor relations matters. *See* N.Y.Civ.Serv.Law § 201.7; Administrative Code § 12–305.

Managers occupy a variety of positions, generally involving significant responsibility for the formulation, recommendation and implementation of governmental policies and programs. Managers also generally exercise significant discretionary authority within their areas of responsibility, including the allocation of work or resources, or the direction of personnel. Jenkins Aff. ¶¶ 10–15; Ryan Aff. ¶¶ 8–18; Doherty Aff. ¶¶ 7–13; Baxter Aff. ¶¶ 6–9.

Original Jurisdiction employees generally hold positions that do not involve significant discretionary responsibility with respect to governmental policy or the allocation of work, personnel or resources. Rather, OJ employees typically provide support and assistance to managers to whom they report with respect to matters of policy formulation, personnel, the allocation of resources and other sensitive matters. Jenkins Aff. ¶ 16; Ryan Aff. ¶ 19.

In contrast to managers, unionized employees generally do not occupy positions that involve significant responsibilities for making or implementing policies in given areas or for exercising significant discretionary authority with respect to the direction of the operations of the defendants on such matters as allocation of work or resources, or direction of personnel. Rather, unionized employees typically occupy various clerical, administrative, technical, paraprofessional, professional, service or other support staff positions. Jenkins Aff. ¶¶ 18–19; Ryan Aff. ¶¶ 20–21; Doherty Aff. ¶¶ 14–15; Baxter Aff. ¶ 10.

### B. The Mayoral Directive.

Managerial and OJ employees of each of the defendants have their wages determined by the chief executive officer of their respective employers pursuant to the New York City Charter and Administrative Code and the relevant statutes. Pl.Mem. at 9. This case arises out of the issuance in October 1990 of a directive by Mayor Dinkins to the heads of all mayoral agencies and departments that: (1) "froze" the salaries of City employees not subject to collective bargaining contracts (managers

and OJ employees) who were earning salaries over $40,000 per year, but less than $70,000 per year; and (2) "cut" by five percent the salaries of City employees not subject to collective bargaining contracts earning over $70,000 per year, although no salary of an employee affected by the cut was to be reduced below $70,000 per year (the "Mayoral Directive"). Michael Aff. ¶ 22, Ex. D.

In response to a request from Mayor Dinkins, Michael Aff. ¶ 24, Ex. E, F; Baxter Aff. ¶ 13; Doherty Aff. ¶ 19; Ryan Aff. ¶ 24, other defendants in this case took similar, but not identical, salary actions. Baxter Aff. ¶¶ 14–15, 19 Ex. F–I; Doherty Aff. ¶¶ 17–22, 26–27, Ex. F–K; Ryan Aff. ¶¶ 22–25, Ex. F–G.

The Mayoral Directive was intended to serve two governmental objectives. The first objective was to set an example of financial sacrifices by the City's governmental leadership in difficult financial times. Thus, the Mayor stated in his Memorandum accompanying the Directive that the City's then deteriorating fiscal condition would cause "pain and sacrifices for everyone and the [City's managers] would be abdicating the public trust if [they] did not share in some of the sacrifice." Michael Aff. Ex. D. (M000240). In this regard, the Mayoral Directive was intended to show that the City's highest ranking employees—those employees involved in the management and administration of the City's business and affairs—were bearing their fair share of the City's financial burdens. The Mayor believed that setting an example of "sacrifice at the top" was important for several reasons. Thus,

—The imposition of salary limitations on higher-level employees would underscore both the seriousness of the City's fiscal problems and the administration's approach to those problems.

—The example set by the Mayoral Directive would also help bolster general public confidence at a time when City residents were being asked to bear the burden of the fiscal crisis in the form of service cutbacks and higher City

income and property taxes, among other things.

—Since the City was involved in labor negotiations with certain of its unions and anticipated that the City might request wage and other financial concessions, it was important to demonstrate that the City's higher-level employees, including those with significant responsibility over union employees, were themselves making those types of financial sacrifices. In this regard, the recently submitted Executive Budget contains no amounts for general, across-the-board collective bargaining increases for fiscal years 1993 and 1994, and such increases are likely only in the context of productivity gains.

*See generally* Michael Aff. ¶¶ 25–26, Ex. D, G, H.

The Mayoral Directive's second objective was to save money in the City's budget. Indeed, the Mayoral Directive did permit the City to save at least $15 million that otherwise might have gone to wage increases. Such savings were part of an overall effort to address the City's financial crisis and helped to avoid the need to generate additional savings from further service and program cuts. *See* Michael Aff. ¶¶ 21, 27–30, Ex. A–C, G, I.

By its own terms, the Mayoral Directive expired on June 30, 1991, the end of fiscal year 1991. Michael Aff. ¶ 23, Ex. D. On July 1, 1991, Mayor Dinkins issued a subsequent directive which extended the salary freeze and pay cut into fiscal year 1992. The extension was intended to serve the same governmental objectives as the original Mayoral Directive. Michael Aff. ¶ 32, Ex. J.

### C. Subsequent salary actions instituted by the Mayor.

In October 1991, Mayor Dinkins authorized the issuance of a personnel order implementing a retroactive 3.5% wage increase for fiscal year 1991 for the City's Original Jurisdiction employees (whose salaries had been frozen by the Mayoral Directive). In April 1992, the Mayor authorized the issuance of another personnel order implementing an additional 1% wage increase for OJ employees for fiscal year 1992. As a result of these actions, the OJ employees have now received the same salary increases for fiscal years 1991 and 1992 that employees in the City's main labor unions received pursuant to recently concluded collective bargaining negotiations. Michael Aff. ¶ 33, Ex. K, L.

The Mayor granted these salary increases to OJ employees because he determined that they had sacrificed enough during the past year as a result of the Mayoral Directive. In this regard, while OJ employees occupy confidential positions that involve working closely with managers, they are not managers and are not amongst the City's higher ranking employees. Michael Aff. ¶ 34; *see also* Jenkins Aff. ¶ 16.

In December 1991, the Mayor rescinded the Mayoral Directive, which had the direct effect of restoring the salaries of managers to their pre-Directive levels. While the Mayor also rescinded the "freeze" component of the Mayoral Directive, he did not simultaneously authorize a salary increase for affected City employees. As a result, the salaries of the City's managers earning $40,000 or more per year are now at the same levels they were in October 1990 immediately before the issuance of the Mayoral Directive. Michael Aff. ¶ 35, Ex. M.

The Mayor rescinded the Mayoral Directive principally because of continuing concerns that the continuation of the Mayoral Directive might have adverse effects on the pension benefits of City employees whose salaries had been cut. It had always been the Mayor's policy—as stated in the Mayoral Directive itself—that the Mayoral Directive should not have the effect of reducing pension benefits of affected City employees. Michael Aff. ¶ 36, Ex. D, N, O.

### D. This lawsuit.

Plaintiffs contend that defendants' salary actions violated Federal and New York State equal protection guarantees by irrationally discriminating between managers and nonmanagerial employees (unionized and OJ employees) since the latter received salary increases after the Mayoral Directive went in force. Plaintiffs also con-

tend that defendants' salary actions violated Federal and New York State constitutional due process guarantees as well as the New York City Charter.

Defendants filed a motion for summary judgment on May 15, 1992 which plaintiffs opposed on May 29, 1992. Defendants replied on June 5, 1992 and argument was held on June 19, 1992.

### III. *The Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted when the court concludes from the record before it that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The mere existence of disputed facts will not preclude entry of summary judgment. *See, e.g., Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Cubby, Inc. v. CompuServe Inc.*, 776 F.Supp. 135, 138 (S.D.N.Y.1991); *United Bank of Kuwait PLC v. Enventure Energy Enhanced Oil Recovery Assoc.*, 755 F.Supp. 1195, 1199 (S.D.N.Y.1989). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Herbert Constr. Co. v. Continental Ins. Co.*, 931 F.2d 989, 993 (2d Cir.1991).

Once the moving party meets its burden by "pointing out the absence of evidence to support the nonmovant's claims," *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir.1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)), the burden shifts to the nonmoving party to establish that a genuine issue of fact exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. at 2511.

The nonmoving party must then produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249–50, 106 S.Ct. at 2511; *see also Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmoving party may not simply rely upon "[s]peculation, conclusory allegations, and mere denials ... to raise genuine issues of [material] fact." *National Westminster Bank v. Ross*, 676 F.Supp. 48, 51 (S.D.N.Y.1987); *see also Delaware & Hudson Ry. Co. v. Conrail*, 902 F.2d 174, 178 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). Rather, the nonmoving party "must provide 'concrete particulars' showing that a trial is needed, and '[i]t is not sufficient merely to assert a conclusion without supplying supporting argument or facts.'" *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (citation omitted); *see also Resource Developers, Inc. v. Statue of Liberty–Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir.1991).

### IV. *Plaintiffs' Equal Protection Claims*

Plaintiffs' equal protection claims allege that defendants' decision not to grant managers a salary increase and to cut the salaries of certain managers, while agreeing to salary increases for nonmanagerial employees, violates the Equal Protection Clause. *See* Complaint ¶¶ 25–35 (Claim One), ¶¶ 44–45 (Claim Four). This complaint is economic—that defendants' decision to set salaries for different groups of employees based upon employee classifications established by the State and City legislatures violates the Constitution.

### A. The Rational Basis Standard

■ An equal protection challenge based upon an economic classification must be judged under a "rational basis" standard. This standard of review has been derived by a long line of cases and is extremely deferential. Indeed, where governmental action implicates purely economic interests,

"courts have not, since the days of the Depression, interfered with legislative judgments rationally related to a legitimate governmental objective." *Image Carrier Corp. v. Beame,* 567 F.2d 1197, 1203 (2d Cir.1977), *cert. denied,* 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239 (1979).

The rational basis standard has two prongs: (1) the challenged action must have a legitimate purpose and (2) it must have been reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose. *Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981); *see Lyng v. International Union, United Auto. Aerospace & Agricultural Implement Workers,* 485 U.S. 360, 370, 108 S.Ct. 1184, 1192, 99 L.Ed.2d 380 (1988); *Schweiker v. Wilson,* 450 U.S. 221, 235, 101 S.Ct. 1074, 1083, 67 L.Ed.2d 186 (1981) (governmental regulation will be upheld under rational basis scrutiny "[a]s long as the classificatory scheme chosen ... rationally advances a reasonable and identifiable governmental objective"); *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 461–63, 101 S.Ct. 715, 722–23, 66 L.Ed.2d 659 (1981); *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979); *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976); *701 Pharmacy Corp. v. Perales,* 930 F.2d 163, 166 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 67, 116 L.Ed.2d 42 (1991).[4]

An economic classification such as the defendants' salary actions "will not be set aside if any state [set] of facts reasonably may be conceived to justify it." *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Indeed, defendants' actions are entitled to a "presumption of rationality that can only be overcome by a clear showing or arbitrariness and irrationality." *Hodel v. Indiana,* 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981); *see also Brown v.*

*Bowen,* 905 F.2d 632, 635 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 979, 112 L.Ed.2d 1064 (1991); *701 Pharmacy Corp. v. Perales,* 930 F.2d at 166 (economic regulation " 'presumed to be valid' "); *New York State Ass'n of Career Schools v. State Educ. Dep't,* 749 F.Supp. 1264, 1273 (S.D.N.Y.1990) ("review of the classification must presume that the Legislature acted within constitutional limits"); *Subway–Surface Supervisors Ass'n v. New York City Transit Auth.,* 56 A.D.2d 53, 59, 392 N.Y.S.2d 460, 466 (2d Dep't 1977) ("power of the Legislature to regulate fiscal affairs is greater, in relation to the Equal Protection Clause, than in any other field"), *modified on other grounds,* 44 N.Y.2d 101, 375 N.E.2d 384, 404 N.Y.S.2d 323 (1978).

In addressing the first prong of the rational basis test—whether the governmental purpose is legitimate—the governmental action will be upheld if the court can "conceive" of a legitimate governmental purpose. *See United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980); *McGowan v. Maryland,* 366 U.S. at 425–26, 81 S.Ct. at 1104–05; *Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960); *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 488–89, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955). Courts are not empowered to weigh the merits of alternatives, rather the "review is confined to the *legitimacy* of the purpose." *Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. at 670, 101 S.Ct. at 2084 (citation omitted). Moreover, the articulated governmental purpose is presumed to be a true purpose unless the facts clearly establish otherwise. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 463 n. 7, 101 S.Ct. at 723 n. 7.

Similarly, courts will not inquire into whether the classification at issue is the best way to effectuate a legitimate state purpose. "As long as the classifica-

---

**4.** The New York State Constitution's Equal Protection Clause is no broader in coverage than its Federal counterpart. *Under 21, Catholic Home Bureau for Dependent Children v. City of New York,* 65 N.Y.2d 344, 360 n. 6, 482 N.E.2d 1, 7 n. 6, 492 N.Y.S.2d 522, 528 n. 6 (1985); *Long Island Lighting Co. v. Assessor of Brookhaven,* 154 A.D.2d 188, 194 n. 4, 552 N.Y.S.2d 336, 339 n. 4 (2d Dep't 1990).

tory scheme chosen ... rationally advances a reasonable and identifiable governmental objective, [the court] must disregard the existence of other methods of allocation." *Schweiker v. Wilson*, 450 U.S. at 235, 101 S.Ct. at 1083; *see also New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976) (Supreme Court "consistently defers to legislative determinations as to the desirability of particular statutory discriminations.").

Moreover, the facts upon which an economic classification has been made are presumed true. Where economic classifications are concerned, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley*, 440 U.S. at 111, 99 S.Ct. at 949; *Klotsche v. City of New York*, 621 F.Supp. 1113, 1118 (S.D.N.Y.1985).

A classification also will be upheld notwithstanding that it suffers from under- or overinclusiveness. *See Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970); *701 Pharmacy Corp. v. Perales*, 930 F.2d at 166. The test for constitutional purposes is not whether the legislative scheme is imperfect, but whether it is entirely irrational. *Pennell v. San Jose*, 485 U.S. 1, 14, 108 S.Ct. 849, 858, 99 L.Ed.2d 1 (1988). Indeed, the Supreme Court emphasized that the courts:

> will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [courts] can only conclude that the legislature's actions were irrational.

*Vance v. Bradley*, 440 U.S. at 97, 99 S.Ct. at 943.

**B. The defendants' purposes were legitimate.**

There is no triable issue of fact as to whether defendants have satisfied the "purpose" prong of the rational basis standard. In the Mayor's memorandum to the heads of City agencies which accompanied the Mayoral Directive, the Mayor stated that the salary actions were intended to serve two principal governmental objectives: (1) to set an example of sacrifice by the City's managerial workforce in times of fiscal austerity and (2) to effect savings in the City's budget. Michael Aff. Ex. D (M000240). The Mayor reiterated these objectives on several occasions. Michael Aff. Ex. E, G, H, J.

There is no doubt that having the City's highest ranking employees set an example of financial sacrifice to bolster public confidence at a time of fiscal crisis is a legitimate governmental purpose. *See, e.g., Plumbers Union Local No. 16 v. Omaha*, 946 F.2d 599, 601 (8th Cir.1991) (City has "legitimate interest in restoring and maintaining public confidence in" public board).

Similarly, there can be no question that generating budget savings, particularly during a budget crisis, is a legitimate governmental purpose. *See Pineman v. Fallon*, 842 F.2d 598, 602 (2d Cir.), *cert. denied*, 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 48 (1988). Indeed, "[p]laintiffs do not contend that saving money, particularly in times of fiscal crisis, is not a legitimate governmental purpose." (*See* Kiok April 10, 1992 letter to the court at 2).

Plaintiffs do not—because they cannot—challenge the legitimacy of either of defendants' stated objectives.[5] Rather, plaintiffs' have attempted to convince the court to disregard defendants' stated objectives by purportedly showing that they are not the "real" reasons for defendants' salary actions. Thus, plaintiffs contend that defendants never mentioned or relied upon the "sacrifice" objective before it was raised in their summary judgment motion

---

**5.** The salary actions taken by the other defendants also were intended to set examples of "sacrifice at the top" and to demonstrate their commitment to avoid additional cut-backs in services or programs. In addition, the actions taken by the other defendants were intended to demonstrate support for the Mayor in his efforts to address the City's difficult financial condition. Doherty Aff. ¶¶ 23–25; Ryan Aff. ¶¶ 26–28; Baxter Aff. ¶¶ 16–18. Plaintiffs do not—again, because they cannot—challenge the legitimacy of this latter purpose.

papers, and that this objective was invented during this litigation because defendants realized that their other stated objective—generating budgetary "savings"—was not sufficient to sustain the challenged salary actions. Pl.Mem. at 2–4, 29.

■ It is a fundamental principle of equal protection analysis, however, that this court must accept defendants' stated objectives as true absent a factual showing by plaintiffs that such objectives could not have been the real objectives. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. at 463 n. 7, 101 S.Ct. at 723 n. 7. Indeed, the government's stated objectives must be accepted as true for purposes of equal protection analysis even if the stated objectives were not set forth at the time of the challenged actions. *See Fetterusso v. New York*, 898 F.2d 322, 325 (2d Cir.1990); *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 450, 105 S.Ct. 3249, 3259, 87 L.Ed.2d 313 (1985) (addressing objectives first asserted "[i]n the courts below"); *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 619, 105 S.Ct. 2862, 2866, 86 L.Ed.2d 487 (1985) (noting that one of state's asserted objectives was "refined" during litigation).

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), and other cases cited by plaintiffs to support their argument for second-guessing defendants' stated purposes (Pl.Mem. at 24–28), actually reinforce the applicability of the deferential standard of judicial review in equal protection cases when the government articulates a valid purpose, as defendants have done in this case. In each case on which plaintiffs rely, the court accepted the asserted governmental objectives and proceeded to analyze the rationality of the means chosen to achieve those objectives. In each case, it was only after the court determined that the means chosen were so unrelated to the achievement of the stated objectives that the court concluded that the real objective must have been an impermissible one. *See, e.g., id.* at 447–50, 105 S.Ct. at 3258–59 (prejudice against the mentally retarded); *Plyler v. Doe*, 457 U.S. 202, 227–30, 102 S.Ct. 2382, 2400–2401, 72 L.Ed.2d 786 (1982) (discrimination against children of illegal aliens);

*Zobel v. Williams*, 457 U.S. 55, 65, 102 S.Ct. 2309, 2315, 72 L.Ed.2d 672 (1982) (discrimination against new residents); *Williams v. Vermont*, 472 U.S. 14, 27, 105 S.Ct. 2465, 2473, 86 L.Ed.2d 11 (1985) (discrimination against non-residents).

■ None of the cases relied on by plaintiffs remotely supports the proposition that, where the government has demonstrated a rational relationship between the means chosen and the stated lawful purposes, plaintiffs can raise, as a triable issue of fact, the question of whether the articulated purpose is the "true" purpose. As demonstrated below, defendants have made just such a showing. Accordingly, even if defendants first articulated the objectives at issue in their summary judgment motion papers, such objectives must be taken as true.

In any event, the indisputable documentary record before this court flatly contradicts plaintiffs' contention that defendants recently have invented the "sacrifice" objective, and must be attempting to hide the "real" reasons for their actions. That record demonstrates that, from the time the Mayoral Directive was issued, the Mayor repeatedly explained that the Directive was intended to serve the objectives of "sacrifice" and "savings." For example:

—In an October 22, 1990 letter to Mayoral agency heads announcing the implementation of the Mayoral Directive, the Mayor noted that the City's "grave" fiscal situation would cause "pain and sacrifices for everyone" and that managers "would be abdicating the public trust" if they "did not share some of the sacrifice." Michael Aff. Ex. D (M000240).

—In a press conference held on October 22, 1990, Mayor Dinkins noted that the City "cannot exempt management" from the demands imposed by the City's fiscal crisis and that managers "must bear our share of the pain" caused by that situation. Michael Aff. Ex. G at 3 (M002233). The Mayor also noted that the Mayoral Directive was "part of our [the City's] austerity program to close our budget gaps in the current and coming fiscal years," *id.* at 1 (M002231), and that the salary ac-

tions instituted by the Mayoral Directive "represent[ed] a savings of at least $4 million in the current year." *Id.* at 2. (M002232). The Mayor reemphasized these same points in a press release issued on the same day. Michael Aff. Ex. H.

—In letters to certain non-Mayoral agencies following the issuance of the Mayoral Directive, the Mayor urged those agencies to institute similar salary actions and thereby "set[ ] an example of fiscal prudence which will have a positive impact upon your peers in government and the people of this City." *See, e.g.,* Michael Aff. Ex. E.

—In a July 1, 1991 letter to Mayoral agency heads announcing the extension of the Mayoral Directive for fiscal year 1992, the Mayor praised the City's managers for "accepting the pain and sacrifice which [they] were asked to share," and stated that in extending the Mayoral Directive he was again asking managers to "sacrifice in these difficult times." Michael Aff. Ex. J (M002630).

While plaintiffs complain that they have not had enough discovery, they have apparently not availed themselves of the opportunity to review all of the discovery that they have had.[6]

C. There is a rational relationship between the classification and defendants' actions.

 As with defendants' objectives, there is no genuine triable issue that the

means chosen to achieve those objectives—the different treatment of managers and non-managers with respect to salaries—is rational.

In formulating the Mayoral Directive, as well as the related salary actions thereafter, the Mayor and the other defendants employed a pre-existing legislative classification. The Mayoral Directive applied solely to those employees designated as "managerial" or "confidential" employees and, thus, not eligible for collective bargaining under the State and City civil service laws. In denying managers the right to collectively bargain, the City and State legislatures recognized that managers are among the highest ranking employees in government and are charged with formulating, recommending and implementing governmental policies (including labor, budget and personnel policies), and directing the business and affairs of the City. *See* Civil Service Law § 201.7(a). These employment characteristics of managers—which caused the legislature to remove their salary determinations from the collective bargaining process and place them exclusively under the control of the Mayor and the other defendants—are the very characteristics that could and did lead defendants reasonably to conclude that managers were the employees best able to set an example of personal sacrifice badly needed during a time of fiscal crisis and to help generate budgetary savings.

It is clear that defendants could and did rationally conclude that their managerial

---

**6.** Plaintiffs' complaint that their opportunities for discovery were "very limited" (Pl.Mem. at 2) is belied by the record. The City Defendants alone produced over 8,000 pages of documents, including all nonpriviliged documents referring to or discussing the challenged salary actions, as well as extensive personnel and salary data created specifically to respond to plaintiffs' requests.

Plaintiffs also complain that Commissioner James F. Hanley's deposition did not provide them with the information as to the purposes underlying defendants' challenged salary actions. *See* Kiok Aff. ¶ 3. However, such information is contained in the documentary record produced in discovery.

While on the subject of discovery, plaintiffs state that the court should not accept the factual

showing in defendants' affidavits as the "gospel truth," Kiok Aff. ¶ 4, and that further broad discovery would allow plaintiffs to present additional facts that allegedly are within the sole possession of defendants. *Id.;* Pl.Mem. at 2, 4. These pleas, however, provide no basis for plaintiffs to withstand defendants' motion for summary judgment. *See, e.g., Contemporary Mission, Inc. v. U.S. Postal Service,* 648 F.2d 97, 107 (2d Cir.1981) (nonmovant may not survive summary judgment by speculating that further discovery might enable it to establish a triable issue of fact); *National Westminster Bank v. Ross,* 676 F.Supp. 48, 51 (S.D.N.Y.1987) (nonmoving party cannot withstand summary judgment through "[s]peculation, conclusory allegations and mere denials").

employees were best suited to demonstrate sacrifice by those persons perceived to be in leadership positions in City government. Similarly, defendants could and did rationally conclude that non-program or operational related savings could be generated from amongst the City's highly compensated employees and a group of employees over whose salaries they possessed direct discretion—the managers.

While they seek to challenge the rationality of defendants' differing treatment of managerial and nonmanagerial employees, plaintiffs either affirmatively concede or fail to contest the material facts that underlie the means chosen by defendants to further their legitimate governmental purposes. Thus:

—plaintiffs concede that the wages of managerial employees are within the sole discretion of the governing bodies of each defendant. Pl.Mem. at 9; Yourman Aff. ¶ 8. By contrast, the wages of unionized, non-managers are governed by the collective bargaining process. Jenkins Aff. ¶ 5; Ryan Aff. ¶ 6; Doherty Aff. ¶ 6; Baxter Aff. ¶ 4;

—plaintiffs offer no challenge to defendants' demonstration that employees are designated as managers based upon factors relating to their job responsibilities and duties. Pl.Mem. at 8. Such factors include "whether the employee's position involves responsibilities for participating in the development, recommendation or implementation of policies within an agency or institution and whether the position involves significant responsibilities with respect to personnel, collective bargaining or labor relations matters." Hanley Aff. ¶ 6;

—plaintiffs concede that at least some managers are responsible for formulating governmental policies (Pl.Mem. at 29–30), and that a majority of managers have significant discretion with respect to the implementation of such policies, including the allocation of work and resources. *See, e.g.*, Pl. Mem. at 28; Pl. 3(g) Stmt. ¶ 4; Yourman Aff. ¶ 5; Kiok Aff. ¶ 16. Plaintiffs also do not challenge defendants showing that managers as a group are among the highest ranking employees of defendants; and

—plaintiffs do not contest defendants' showing that—unlike most managers—the vast bulk of nonmanagerial employees do not occupy positions that involve significant responsibilities for formulating and directing the implementation of defendants' policies. Jenkins Aff. ¶ 18; *see also* Baxter Aff. ¶ 10; Ryan Aff. ¶ 20; Doherty Aff. ¶ 14.

Plaintiffs' failure to challenge the material facts set forth above provides a sufficient basis for this court to grant defendants' summary judgment motion. Given these undisputed facts, there can be no triable issue as to the rationality of defendants' decision to look to managers to further the legitimate governmental purposes of setting examples of financial sacrifice by the City's highest ranking employees and realizing budgetary savings.

Against these undisputed facts plaintiffs offer two principal challenges to the rationality of the classification at issue, one focusing on the "sacrifice" objective and one on the "savings" objective.

Thus, plaintiffs contend that defendants' challenged classifications are under- and overinclusive. As to the former, plaintiffs contend that there are non-managers who exercise significant discretion with respect to the formulation and implementation of policies, including allocation of personnel and resources. Plaintiffs have, however, carefully couched the language of their Memorandum and accompanying affidavits to avoid stating that a majority—or even a significant percentage—of non-managers have managerial-type duties and responsibilities. Rather, plaintiffs state that "some" (Pl.Mem. at 28) or "significant numbers" (Yourman Aff. ¶ 6) of non-managers exercise substantial discretionary authority. *See also* Kiok Aff. ¶ 16. Moreover, plaintiffs offer meager support for even these watered down contentions, providing examples of only five groups of nonmanagerial employees among the vast workforces of the City Defendants that allegedly have duties and responsibilities similar to those of managers: (i) school

principals, (ii) certain Fire Department Chiefs, (iii) certain Police Department Captains, (iv) certain superintendents in the Department of Sanitation, and (v) certain Principal Administrative Associates. Pl. Mem. at 8–9; Kiok Aff. ¶ 16; Yourman Aff. ¶ 6.

The examples chosen by plaintiff hardly support a finding that the classification at issue is grossly underinclusive and therefore irrational. For example, most of the nonmanagerial titles cited by plaintiffs cover members of the City's uniformed forces that, because of the unique command structures of these forces, are not representative of the vast majority of defendants' nonuniformed governmental employees, whether managerial or nonmanagerial. In any event, the uniformed titles cited by plaintiffs demonstrate the rationality of the distinctions drawn between higher and lower-ranking employees. Thus, the Taylor Act specifically designates higher-ranking Police Department Captains and Fire Department Chiefs, as "managerial" and "confidential," while permitting lower-ranking Captains and Chiefs to collectively bargain. Civil Service Law §§ 201.7(c), 201.7(e).

Plaintiffs also imply that the classification is overinclusive because certain employees are improperly designated as managerial. Pl.Mem. at 9. As plaintiffs acknowledge, managers who believe that they have been improperly classified may pursue an administrative remedy with the Office of Collective Bargaining (the "OCB") to be redesignated as eligible for collective bargaining.[7] Pl.Mem. at 7–9; see also Hanley Aff. ¶ 9. The alleged misclassification of some managers, however, does not provide a basis for a Federal Constitutional lawsuit.

Ultimately, to establish an equal protection violation, plaintiffs must demonstrate that the classifications chosen by defendants are " 'so unrelated to the achievement of any combination of legitimate purposes that [this court] can only conclude

that [their] actions were irrational.' " *Gregory v. Ashcroft,* —— U.S. ——, ——, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991) (citation omitted); *see also Pennell v. San Jose,* 485 U.S. 1, 14, 108 S.Ct. 849, 858, 99 L.Ed.2d 1 (1988). Plaintiffs' anecdotal examples of alleged under- and overinclusiveness do not give rise to a triable issue of fact with respect to the overall rationality of defendants' classification scheme. At best, plaintiffs' contentions go to defendants' precision in drawing lines between their managerial and nonmanagerial classes of employees. As the Supreme Court recently reemphasized, however, "a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.' " *Gregory v. Ashcroft,* —— U.S. at ——, 111 S.Ct. at 2407 (quoting *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. at 316, 96 S.Ct. at 2568 (quoting *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970))); *see also* City Defs.Mem. at 33.

Plaintiffs next argue that defendants' salary actions did not rationally further the "savings" objective because in plaintiffs' opinion the savings generated are insignificant. Plaintiffs admit, however, that the Mayoral Directive has yielded approximately $15 million in savings for the City. Pl.Mem. at 30; *see also* Michael Aff. ¶¶ 27–29. Moreover, plaintiffs do not contest defendants' demonstration that the salary actions taken by the other defendants yielded millions of dollars in additional savings. *See* Ryan Aff. ¶ 28; Doherty Aff ¶ 25; Baxter Aff. ¶ 18.

While plaintiffs contend that these amounts are insignificant in relation to the size of the overall budgets of defendants, the savings are real. Moreover, as set forth in the affidavits submitted by the City Defendants, the challenged salary actions were part of comprehensive programs by various defendants to generate budgetary savings. Michael Aff. ¶ 30; Ryan Aff. ¶ 28; Doherty Aff ¶ 25.[8] Each component

---

**7.** Indeed, one union has recently filed such a petition, seeking to have a group of managers holding Assistant Deputy Warden positions redesignated so as to be entitled to union representation. *See* Hanley Aff. ¶ 13.

**8.** For this reason, plaintiffs' attempts to compare the savings generated by defendants' salary actions to the size of the City budget is inappropriate and misleading. The appropriate comparison is to the amount of overall budget sav-

of such a large-scale budget savings plan—if examined in isolation—may appear small. Yet, in challenging the rationality of a single portion of a budget-saving scheme, plaintiffs impliedly challenge defendants' entire program to reduce and control governmental spending. Plaintiffs do not attempt to argue that defendants' austerity programs as a whole produced insignificant savings. Thus, once again plaintiffs have failed to establish that defendants' salary actions are irrational.

Unable to raise material issues of fact with respect to the classification actually at issue here, plaintiffs resort to mischaracterizing the classification to demonstrate that there is no rational relationship between such invented classifications and defendants' objectives of "sacrifice" and "savings."

*First,* plaintiffs argue that defendants have improperly established a classification based solely upon the union or non-union status of governmental employees. Pl. Mem. at 24. In support of their argument, plaintiffs contend that New York courts have held that managerial employees, as a group, are similarly situated to all other City employees and may not be singled out for purposes of differential salary treatment. Pl.Mem. at 17–18. In fact, the cases cited by plaintiffs in no way stand for this broad proposition. Rather, the cases are fact specific and principally involve salary distinctions between two limited groups of employees occupying identical or virtually identical job positions.[9]

None of the cases cited by plaintiffs remotely involve the broader classifications at issue here which are based upon the differences in the characteristic job responsibilities and duties of the classes of unionized and nonunionized City employees. It is because of the typically policy-related and discretionary job responsibilities of managers that the State and City legislatures chose to exclude managers from the collective bargaining process. It is those same characteristic job responsibilities that warranted a decision by the Mayor (and the governing bodies of the other defendants) reasonably to turn to managers as the group best able to shoulder the burdens of sacrifice and savings imposed by the challenged salary actions.[10]

It must be emphasized that plaintiffs in this case are a group of managers who are excluded from the collective bargaining process by State and City law. They challenged the constitutionality of defendants initial salary actions which applied not only to managers but to certain nonunionized, nonmanagerial employees whose salaries, like those of managers, are within the discretion of defendants—the OJ employees. This initial classification, derived from the

ings generated by defendants. For example, the HHC's salary actions yielded over $12 million of the $300 million in budgetary savings realized by the HHC for fiscal years 1991 and 1992. Doherty Aff. ¶ 25.

9. Thus, plaintiffs rely upon cases involving salary disparities among different groups of judges (*see, e.g., Weissman v. Evans,* 56 N.Y.2d 458, 438 N.E.2d 397, 452 N.Y.S.2d 864 (1982); *Weissman v. Bellacosa,* 129 A.D.2d 189, 517 N.Y.S.2d 734 (2d Dep't 1987); *Kendall v. Evans,* 126 A.D.2d 703, 510 N.Y.S.2d 910 (2d Dep't 1987), *aff'd,* 72 N.Y.2d 963, 531 N.E.2d 294, 534 N.Y.S.2d 662 (1988)), school administrators (*see Schneider v. Ambach,* 135 A.D.2d 284, 526 N.Y.S.2d 857 (3rd Dep't 1988)), and train supervisors (*see Margolis v. New York City Transit Auth.,* 157 A.D.2d 238, 555 N.Y.S.2d 711 (1st Dep't 1990)). Plaintiffs also cite a case which involved a salary freeze of similarly situated employees within a single collective bargaining unit. *See Nassau Chapter, Civil Serv. Employees Ass'n v. County of Nassau,* 88 Misc.2d 289, 387 N.Y.S.2d 772 (Sup.Ct.1976).

Moreover, the single case cited by plaintiffs which involved a classification between union and non-union employees is also inapposite. *See Scime v. County Legislature of Erie County,* 90 Misc.2d 764, 395 N.Y.S.2d 952 (Sup.Ct.1977). The limited groups of union and non-union employees at issue in *Scime,* like the employees in the other cases cited by plaintiffs, had substantially similar job responsibilities and were in the same pay grade. *See id.* at 767–68, 395 N.Y.S.2d at 955–56. Plaintiffs puzzlingly rely upon *Abrams v. Bronstein,* 33 N.Y.2d 488, 310 N.E.2d 528, 354 N.Y.S.2d 926 (1974), which involved differing treatment of groups of persons who had taken a civil service exam following the settlement of a class action suit, a fact pattern hardly relevant to the case at bar.

10. Thus, plaintiffs' assertion that managers and non-managers are "similarly situated" with respect to various factors unrelated to job responsibilities, such as pension fund membership and vacation and sick leave benefits (*see, e.g.,* Yourman Aff. ¶ 10), is yet another constitutional irrelevancy.

benefits of collective bargaining and employees in managerial, policy-making and confidential jobs, was a rational classification even though it included the OJ employees. With the subsequent modifications in the Mayor's salary policy, the classification is now between managers and non-managers, whether or not unionized.

As explained below, the granting of salary increases to OJ employees who are not managers, and are not among the higher level employees of the City, made the challenged classification more precise. As applied to plaintiffs in this case—the managers—the classification established in the initial Mayoral Directive and the classification established in the subsequent modifications were rational means to achieve the lawful purposes of "sacrifice" and "savings."

*Second,* plaintiffs argue that the rationality of defendants' differing treatment of employees over whose salaries they have direct discretion is undermined by the fact that the City and BOE granted wage increases to the OJ employees. Once again, plaintiffs ignore that the operative classification is not simply between employees over whose salaries defendants have direct discretion and those over whom they do not. With the granting of salary increases to the OJ employees, the challenged classifications now distinguish between managers and non-managers, whether unionized or nonunionized, based upon their differing characteristic job responsibilities.

The decisions by the Mayor and the BOE to grant salary increases to OJ employees arguably made the original classifications even more precise.[11] Indeed, plaintiffs concede as much when they describe OJ employees as employees whose duties and responsibilities are substantially similar to the duties and responsibilities of nonmanagerial, unionized employees, and not managers. Pl.Mem. at 7; *see also* Kiok Aff. ¶ 13; Yourman Aff. ¶ 9. Plaintiffs provide no basis for challenging the rationality of

the Mayor and BOE's conclusion that their lower-level OJ employees had sacrificed enough—while continuing to mandate that their managers provide examples of "sacrifice at the top" and contribute to budget savings programs.

*Third,* plaintiffs argue that it was irrational not to grant managers a salary increase because some non-managers earn more than some managers. Indeed, Plaintiffs' Memorandum and Affidavits are rife with comparisons of the relative wages of managers and their non-manager subordinates. *See, e.g.,* Pl.Mem. at 11–12; Kiok Aff. ¶¶ 25–29. Plaintiffs also discuss the results of a survey of the membership of plaintiff MEA in which managers registered complaints "that they earn less than their subordinates, even without considering overtime pay." Kiok Aff. ¶ 29.

Plaintiffs' preoccupation with the relative salary levels of managerial and non-managerial personnel is once again irrelevant to the classification at issue in this case. Defendants have not treated managers differently from other employees simply because they make more than non-managers, but because managers are amongst the highest-ranking employees in City government. In any event, plaintiffs offer no real challenge to defendants' showing that managers as a group are amongst the highest paid employees of defendants. In light of these characteristics, defendants could and did rationally conclude that managers were in the best financial position to make the sacrifices required by the challenged salary actions.

*Finally,* plaintiffs urge this court to implement a policy recommendation made by the Mayor's Managerial Review Commission that City managers be granted a salary increase "when the City's financial situation allows it." *See* Pl.Mem. at 16. According to plaintiffs, the time is right for a raise because the City recently announced a budget surplus. But the decision wheth-

---

**11.** It certainly was reasonable for the Mayor and Board of Education to decide that OJ employees, who generally are not among the highest ranking or most compensated employees, had sacrificed enough—while still requiring that the managerial leadership of the City and the Board of Education continue to provide an example of "sacrifice at the top." Moreover, governmental actors are entitled to approach a problem "one step at a time." *See, e.g., Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955).

er to accept and possibly implement the Commission's policy recommendations is the Mayor's to make and certainly does not present a constitutional question to be resolved in a Federal Court. The Equal Protection Clause does not permit the courts to second-guess the wisdom of personnel and budgetary policy decisions made by defendants. *Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. at 670, 101 S.Ct. at 2084; *see also Brown v. Bowen,* 905 F.2d 632, 635 (2d Cir.1990) ("how public funds should be spent" are subject to particular deference), *cert. denied,* —— U.S. ——, 111 S.Ct. 979, 112 L.Ed.2d 1064 (1991).

## V. *Plaintiffs' Due Process Claims*

■ Plaintiffs' Corrected First Amended Complaint contains three claims for relief alleging that various aspects of defendants' challenged salary actions deprived plaintiffs of due process under the United States and New York State Constitutions. *See* Complaint ¶¶ 36–38 (Claim Two), ¶¶ 39–43 (Claim Three), ¶¶ 46–48 (Claim Five).

Defendants demonstrate in their papers that plaintiffs' due process claims are meritless under governing constitutional principles. Simply put, there is no due process violation because plaintiffs and other managers have no legitimate claim of entitlement to a particular salary increase, and because, in any event, defendants' salary actions constitute a type of legislative classification that the courts consistently have held does not give rise to a due process violation. *See* City Defs.Mem. at 34–46.

In their opposition papers, plaintiffs do not reply whatsoever to defendants showing with respect to plaintiffs' due process claims. When questioned at oral argument, plaintiffs stated that they considered their due process claims to follow their equal protection claim; therefore, they expected the court's ruling on the equal protection claim to control the due process claims as well. Because the court has granted defendants' motion for summary judgment on the equal protection claim, and because the court sees no merit to plaintiffs' due process claims, the court finds that defendants are entitled to summary judgment dismissing plaintiffs' due process claims.

## VI. *Plaintiffs' City Charter Claim*

■ In a claim premised upon the New York City Charter, plaintiffs contend that the Mayor improperly has impounded appropriated funds which are available in the City budget to grant managers a salary increase. Pl.Mem. at 32–37; *see* Complaint ¶¶ 36–38 (Claim Two).

There is no dispute as to the underlying facts. The adopted City budgets for fiscal years 1991 and 1992 included appropriations to the Miscellaneous Labor Reserve in an amount sufficient to cover a 1.5% salary increase for all City employees, including managers. Michael Aff. ¶ 16; Pl.Mem. at 35. In September, 1991, the City transferred funds from the Miscellaneous Labor Reserve (and the Pension Contribution Agency) to the budgets of various agencies in an amount sufficient to cover salary increases to managers and other non-union employees similar to those raises granted to employees in the City's major labor unions. Michael Aff. ¶ 20; Pl.Mem. at 35.

Plaintiffs claim that the Mayor's failure to direct that managers be paid a salary increase from the transferred funds constitutes a wrongful impoundment of such funds in violation of the City Charter and apparently contend that they are entitled to an award of the allegedly impounded funds. Pl.Mem. at 34–37. Like their due process claims, plaintiffs' Charter claim is fundamentally flawed.

■ Even assuming that the Mayor wrongfully impounded the funds in question, plaintiffs have no right to recover such funds in the form of a salary increase. Indeed, the only wrongful act alleged by plaintiffs is a failure by the Mayor to provide the City Council with the notice required under the City Charter when funds are impounded. Pl.Mem. at 34; *see* New York City Charter § 106(e). The only appropriate remedy—even assuming plaintiffs have standing to assert their claim— would be to direct the Mayor to comply with the Charter by providing the required notice.

A recent case relied upon by plaintiffs in support of their City Charter claim recognizes that courts may not substitute their judgment for that of the Mayor where matters of budgetary discretion are involved. In *New York Pub. Interest Research Group v. Dinkins*, Index No. 29818/91, N.Y.L.J. May 12, 1992, p. 22, col. 1 (Sup.Ct. 1st Dep't) (Ciparick, J.), plaintiffs initiated an Article 78 proceeding under New York state law seeking to require the Mayor, the City Council and certain other elected officials to establish and fund the Independent Budget Office ("IBO"). Plaintiffs contended that the City Charter mandated that defendants establish and fund the IBO, while defendants contended that the Charter provisions were not mandatory and that they had discretion to decide whether to fund the IBO.

The court ultimately sided with plaintiffs, finding that the Charter's IBO provisions were mandatory and left the defendants with no discretion. In so ruling, however, the court was careful to distinguish between the Charter's mandatory IBO provisions and the defendants' discretion with respect to other budgetary matters. As stated by the court: " 'Manifestly, the courts cannot and will not intervene in the budget process if doing so requires them to substitute their judgment on matters of discretion.' " *Id.* (quoting *Korn v. Gulotta*, 72 N.Y.2d 363, 369, 530 N.E.2d 816, 818, 534 N.Y.S.2d 108, 110 (1988)). *Cf. County of Oneida v. Berle*, 49 N.Y.2d 515, 404 N.E.2d 133, 137, 427 N.Y.S.2d 407, 412 (1980) (since legislature couched appropriation in mandatory terms—and did not delegate discretion to Budget Director to impound appropriated funds—Budget Director could not impound appropriated funds).

Yet, in making their Charter claim, plaintiffs ask this court to engage in precisely the sort of intervention in matters of budgetary discretion that the New York courts have found impermissible. Plaintiffs concede that the Mayor and the chief executives of the other defendants have sole discretion to grant their managers a salary increase and have determined not to do so. *See* Pl.Mem. at 9. Plaintiffs further concede that the Mayor has the discretion to decide not to spend appropriated funds, including by way of impoundment. *See* City Charter § 106(e); *see* Pl.Mem. at 31–32. And the City Charter contains no provision mandating that the Mayor or the other defendants grant their managers a salary increase, even if appropriated funds are available to do so. In light of these undisputed facts, even if there has been a wrongful impoundment—which there has not been—there is no basis for this court to direct the Mayor and the other defendants to grant and pay plaintiffs and the City's other managers a salary increase.

Plaintiffs' City Charter claim suffers from the same flawed reasoning that doomed plaintiffs' due process claims— namely, that plaintiffs are entitled to be granted and paid a salary increase from a particular appropriation. As demonstrated in the City Defendants' Memorandum and the accompanying affidavits, there is no such entitlement. City Defs.Mem. at 36–42; Michael Aff. ¶¶ 6–20; Jenkins Aff. ¶¶ 7–8.

 City Council approval of an appropriation to the Miscellaneous Labor Reserve does not constitute a salary increase. Nor does such an appropriation require the Mayor to grant employees a salary increase. Rather, an appropriation to the Miscellaneous Labor Reserve is a budgeting tool that provides a source of funds to pay a salary increase should the Mayor decide to grant one at a later date.

 Neither did the transfer of funds from the Miscellaneous Labor Reserve (and the Pension Contribution Agency) to various agency budgets relied upon by plaintiffs constitute a salary increase for managers by the Mayor. The notice of the transfer provided to the City Council makes this clear, stating that the "transfer is necessary to provide funding in the agencies to allow for the implementation of fiscal 1991 and 1992 salary rate adjustments negotiated with various unions"— not managers. Michael Aff. Ex. B.

While, as plaintiffs note, the notice also stated that the amount transferred included "the costs [of possible increases] for all civilian employees, even those whose un-

ions have not reached agreements with the City and those not represented by unions, including managerial employees," *id.,* this language makes clear that the transfer was a budgeting tool designed to make funds available should the City enter into additional collective bargaining agreements or should the Mayor determine to grant managers a salary increase in the future.[12] As plaintiffs acknowledge, the funds at issue remain in City agency budgets and continue to be available for such purposes. Accordingly, the undisputed facts make clear that the Mayor has not impounded the transferred funds.

## VII. *Conclusion*

There is no genuine issue of material fact that defendants' actions were rationally related to the achievement of legitimate governmental objectives, and thus do not violate the Equal Protection Clause. Additionally, there is no triable issue of fact that defendants have not deprived plaintiffs of property without due process. Finally, there is no genuine issue of material fact that defendants did not violate the City Charter. Since the court sees no basis for plaintiff's belated claim for pension benefit impairment, defendants' motion for summary judgment is granted without leave to amend.

SO ORDERED.

---

**12.** In Point III of their Memorandum, plaintiffs belatedly assert that the 5% salary cut imposed on certain managers by the Mayoral Directive was a wage deferral that managers must be paid back in order to avoid an impairment of these managers' pension benefits. *See* Pl.Mem. at 37–39. Plaintiffs' assertion is belied by the Mayoral Directive itself and other documents that clearly establish that the wage cut was a salary "reduction," not a wage deferral. *See* Michael Aff. Ex. C, D, F–J, M–O. Moreover, plaintiffs offer no concrete facts demonstrating that any pension payments have been or will be impaired as a result of the temporary wage cut imposed by the Mayoral Directive.